FILED

2018 MAR 26 PM 3:23

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| COUNTY OF MONMOUTH, NEW JERSEY, on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>FLORIDA CANCER SPECIALISTS, P.L.; 21ST CENTURY ONCOLOGY, LLC; DR. WILLIAM N. HARWIN; and DR. DANIEL DOSORETZ,<br><br>        Defendants. | Civil Case No.:<br><br>ANTITRUST CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

Page

NATURE OF ACTION .................................................................................................... 1

JURISDICTION AND VENUE ....................................................................................... 3

RELEVANT MARKETS ................................................................................................. 4

PARTIES ......................................................................................................................... 5

    A.    Plaintiff ...................................................................................................... 5

    B.    Defendants ................................................................................................ 5

AGENTS AND CO-CONSPIRATORS ........................................................................... 6

FACTUAL ALLEGATIONS ........................................................................................... 7

    A.    The Oncology Services Market ................................................................ 7

        1.    Whistleblower Complaint ............................................................ 10

        2.    The Structure and Characteristics of The Market For Oncology Services in Southwest Florida Supports The Existence of a Conspiracy ............................................................ 12

            a.    The Market For Oncology Services Is Highly Concentrated ....................................................................... 12

                i.    The Anticompetitive Effects of Defendants' Supracompetitive Pricing ...................................... 15

            b.    Defendants' Conduct Went Against Their Respective Economic Self-Interests, Absent an Agreement To Divide the Market ...................................... 16

            c.    The Market For Oncology Services Has High Barriers To Entry ............................................................. 18

            d.    Defendants Had Opportunities To Conspire ..................... 19

            e.    The Demand For Oncology Services Is Inelastic ............. 20

    CLASS ACTION ALLEGATIONS ................................................................. 21

PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY ........................... 24

PRAYER FOR RELIEF ................................................................................................. 31

JURY DEMAND ............................................................................................................ 32

Plaintiff County of Monmouth, New Jersey ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws, demands a trial by jury, and alleges as follows:

## NATURE OF ACTION

1.      This lawsuit arises from an unlawful agreement between the two largest cancer treatment centers in Southwest Florida to restrict competition and monopolize the market for Oncology Services (defined herein) in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2).

2.      Plaintiff seeks to represent a Class consisting of all persons and entities in the United States who directly paid for all or a portion of their Oncology Services in Southwest Florida provided by 21st Century Oncology, LLC ("21st Century") or Florida Cancer Specialists, P.L. ("FCS") (together with Dr. William N. Harwin and Dr. Daniel Dosoretz, "Defendants") from 2010 until the effects of their unlawful conduct ceases (the "Class Period").

3.      As used in this Complaint, Oncology Services refers to the medical diagnosis and treatment of cancer using medicine ("Medical Oncology") or radiation ("Radiation Oncology"). Medical Oncology refers to the diagnosis and treatment of cancer with medicine, including chemotherapy, hormonal therapy, biological therapy,

1

and targeted therapy.[1] Radiation Oncology refers to the treatment of cancer with therapeutic radiation.[2]

4. During the Class Period, Defendants entered into a "gentleman's agreement" to eliminate competition and monopolize the market for Oncology Services in Southwest Florida. As part of the agreement, FCS's staff members were instructed to send their Radiation Oncology patients exclusively to 21st Century, while 21st Century's staff would refer all of their Medical Oncology patients to FCS. At the same time, Defendants agreed not to compete with one other's respective Medical Oncology and Radiation Oncology practices in Southwest Florida, effectively allocating the market.

5. As a result of the conspiracy, Defendants were able to charge supracompetitive prices for Oncology Services in Southwest Florida and illegally acquire and maintain monopoly power. Additionally, FCS and 21st Century illegally acquired and maintained monopoly power in the respective submarkets for Medical Oncology services (FCS) and Radiation Oncology services (21st Century) in Southwest Florida.

6. In June 2017, 21st Century disclosed that the Department of Justice ("DOJ") is investigating potential criminal antitrust violations in the market for Oncology Services in Southwest Florida. This investigation is thought to have been initiated in response to a whistleblower action filed in January 2017 ("the Whistleblower

---

[1] National Cancer Institute, *NCI Dictionary of Cancer Terms: Medical Oncologist*, NATIONAL CANCER INSTITUTE, *available at* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/medical-oncologist (last accessed Mar. 21, 2018).

[2] National Cancer Institute, *NCI Dictionary of Cancer Terms: Radiation Oncologist*, NATIONAL CANCER INSTITUTE, *available at* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/radiation-oncologist (last accessed Mar. 23, 2018).

Complaint"). The Whistleblower Complaint was filed by two former FCS employees who accuse FCS and 21st Century of Medicaid fraud and antitrust violations.

## JURISDICTION AND VENUE

7.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiff and the Class and to secure equitable and injunctive relief against Defendants for violating Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under federal law.

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.

9.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

10.    This court has *in personam* jurisdiction over Defendants because each Defendant: (a) transacted business in the United States, including in this District; (b) provided Oncology Services in this District; (c) had substantial aggregate contacts within this District; or (d) was engaged in an illegal antitrust violations that were directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to,

3

the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

11.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and members of the Class. Defendants, directly and through their agents, engaged in activities to monopolize as well as to fix, raise, maintain and/or stabilize prices in Southwest Florida for Oncology Services, which unreasonably restrained trade and adversely affected the market for Oncology Services.

## RELEVANT MARKETS

12.     For purposes of Count I (Conspiracy in Restraint of Trade) and Count II (Conspiracy to Monopolize) the relevant product market is the market for Oncology Services, and to the extent necessary, the relevant geographical market is Southwest Florida, which consists of the following five counties: Manatee County, Sarasota County, Charlotte County, Lee County, and Collier County.

13.     For purposes of Count III (Attempted Monopolization, Conspiracy to Monopolize, and Monopolization by 21st Century and Dr. Daniel Dosoretz), the relevant product market is the market for Radiation Oncology services and the relevant geographical market is Southwest Florida.

14.     For purposes of Count IV (Attempted Monopolization, Conspiracy to Monopolize, and Monopolization by FCS and Dr. William N. Harwin), the relevant

4

product market is the market for Medical Oncology services and the relevant geographic market is Southwest Florida.

<b><u>PARTIES</u></b>

**A.    <u>Plaintiff</u>**

15.    Plaintiff COUNTY OF MONMOUTH, NEW JERSEY ("County of Monmouth") is a county and public entity organized and existing pursuant to the laws of the State of New Jersey. Plaintiff County of Monmouth, through its appointed County Administrator, manages operations of sixty county departments comprised of more than 2,700 employees to deliver services to its residents. The County of Monmouth also operates a self-funded health insurance plan for its employees and retirees and directly paid for all or a portion of the cost of its insureds' Oncology Services provided by Defendants in Southwest Florida during the Class Period.

**B.    <u>Defendants</u>**

16.    Defendant, FLORIDA CANCER SPECIALISTS, P.L. ("FCS"), is a Florida professional limited liability corporation with its principal place of business located at 4371 Veronica South Shoemaker Boulevard, Fort Myers, FL 33916. It was formed in 1998 as a medical oncology/hematology practice based in Fort Myers, Florida. FCS is the largest independent medical oncology/hematology practice in the United States with over 180 physicians, 130 nurse practitioners, and over 90 locations in the FCS network. FCS is a full service cancer care provider that provides Medical Oncology and Radiation Oncology services; however, notably, it does not provide Radiation Oncology services in Southwest Florida from Tampa to Marco Island.

5

17.     Defendant, 21st CENTURY ONCOLOGY, LLC ("21st Century") is a Florida limited liability company with its principal place of business located at 2234 Colonial Boulevard, Fort Myers, Florida 33907. 21st Century is a full service cancer care provider that provides Medical Oncology and Radiation Oncology services; however, notably, it does not provide Medical Oncology services in Southwest Florida from Tampa to Marco Island.

18.     Defendant, Dr. William N. Harwin is the President or "managing physician" of Defendant FCS and is a resident of Fort Myers, Florida. Throughout the Class Period, Harwin colluded and conspired with Dr. Daniel Dosoretz, former Chief Executive Officer of 21st Century, to formulate and carry out a so-called "gentleman's agreement," which ensured that 21st Century and FCS would not compete in the market for Oncology Services in Southwest Florida.

19.     Defendant, Dr. Daniel Dosoretz is the former Chief Executive Officer of 21st Century and is a resident of Fort Myers, Florida. Throughout the Class Period, Dosoretz colluded and conspired with Dr. William N. Harwin, President of FCS, to formulate and carry out a so-called "gentleman's agreement," which ensured that 21st Century and FCS would not compete in the market for Oncology Services in Southwest Florida.

**AGENTS AND CO-CONSPIRATORS**

20.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

6

21.     Various persons, partnerships, agents and individuals not named as

Defendants in this lawsuit, and the identities of which are presently unknown, have

participated as co-conspirators with Defendants in the offenses alleged in this Complaint,

and have performed acts and made statements in furtherance of the conspiracy or in

furtherance of the anticompetitive conduct.

22.     Whenever this Complaint makes reference to any act, deed or transaction

of any corporation or limited liability entity, the allegation means that the corporation or

limited liability entity engaged in the act, deed or transaction by or through its officers,

directors, agents, employees or representatives while they were actively engaged in the

management, direction, control or transaction of the corporation's or limited liability

entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.     The Oncology Services Market

23.     According to the World Health Organization, cancer is one of the leading

causes of "morbidity and mortality worldwide" with 14.0 million new cases in 2012 and

an anticipated increase of roughly 70% over the next two decades.[3] In 2016, there were

an estimated 1.7 million new cancers diagnoses, representing an increase of

approximately 2% since 2015.[4] The steady rise in new cancer cases each year provides a

---

[3] World Health Organization, *Cancer: Fact Sheet*, WORLD HEALTH ORGANIZATION (Feb. 2018), *available at* http://www.who.int/mediacentre/factsheets/fs297/en/ (last accessed Mar. 21, 2018).
[4] The American Society of Clinical Oncology, *The State of Cancer Care in America, 2017:A Report by the American Society of Clinical Oncology*, J. ONCOL. PRACT., *available at* http://ascopubs.org/doi/full/10.1200/JOP.2016.020743 (last accessed Mar. 21, 2018).

7

lucrative opportunity in the market for Oncology Services.[5] Other factors such as

"population demographics, insurance status and type, and changes in physician retirement

rates and productivity,"[6] also contribute to the profitability of Oncology Services.

    24.    The U.S. market for Oncology Services is already concentrated. As of

2012, there were only 1,581 oncology practices throughout the United States.[7]

Furthermore, based on a 2012 ASCO survey of oncology practices, only 480 practices

reported seeing new cancer patients in 2016.[8] Specifically, those practices reported 1.1

million new cancer patients, a considerable portion of the 1.7 million cancer diagnoses in

the United States that year.[9]

    25.    Florida has the second highest number of cancer patients in the country.[10]

According to the Community Oncology Alliance, as of January 2017, Florida was leading

the nation in the number of oncology "practices that have closed, merged, or been

acquired in recent years," with most of these practices "affiliate[ing] with hospitals or

[5] Grand View Research, *Radiation Oncology Market Analysis By Product (External Beam Radiation Therapy, Brachytherapy, Systemic Beam Radiation Therapy), By Application, By Technology, By Region, And Segment Forecasts, 2014 – 2025*, GRAND VIEW RESEARCH (Apr. 2017), *available at* https://www.grandviewresearch.com/industry-analysis/radiation-oncology-market (last accessed Mar. 21, 2018).

[6] W. Yang, J. Williams, *et al.*, *Projected Supply o Demand for Oncology and Radiation Oncologists Through 2025: An Aging, Better-Insured Population Will Result in Shortage*, J. Oncol. Pract., *available at* http://ascopubs.org/doi/full/10.1200/jop.2013.001319 (last accessed Mar. 21, 2018).

[7] The American Society of Clinical Oncology, *The State of Cancer Care in America, 2017:A Report by the American Society of Clinical Oncology*, J. ONCOL. PRACT., *available at* http://ascopubs.org/doi/full/10.1200/JOP.2016.020743 (last accessed Mar. 21, 2018).

[8] The American Society of Clinical Oncology, *The State of Cancer Care in America, 2017:A Report by the American Society of Clinical Oncology*, J. ONCOL. PRACT., *available at* http://ascopubs.org/doi/full/10.1200/JOP.2016.020743 (last accessed Mar. 21, 2018).

[9] American Cancer Society, *Cancer facts & figures 2016*, AMERICAN CANCER SOCIETY, *available at* https://www.cancer.org/research/cancer-facts-statistics/all-cancer-facts-figures/cancer-facts-figures-2016.html (last accessed on Mar. 21, 2018).

[10] M. Rinde, *Consolidation Ripples Out From Florida*, ONCLIVE (Dec. 29, 2016), *available at* http://www.onclive.com/publications/oncology-business-news/2017/january-2017/consolidation-ripples-out-from-florida (last accessed Mar. 21, 2018).

join[ing] large groups like [FCS], one of the nation's biggest physician-owned oncology networks.[11] Constantine Mantz, MD, chief medical officer at 21st Century Oncology—which has 144 centers in 17 states—admits that "we are not seeing the same scale of consolidation elsewhere as we are seeing in Florida."[12]

26.     As small practices are struggling in Florida, larger corporations, like 21st Century and FCS, have emerged as leaders in the Oncology Services market in the state. Indeed, 21st Century and FCS dominate the market for Oncology Services in Florida, particularly in the Southwest region of the state.[13]

27.     21st Century has roughly 100 oncologists in Florida, the majority of them radiation oncologists.

28.     FCS is "a physician-owned mega-group that has grown over three decades to 206 physicians and 100 offices." FCS's CEO, Brad Prechtl, has emphasized the benefits of this dominant market position, stating "[s]ome practices, given their dynamic and their market—if they're the only medical oncologist in that market—it might be easier for them to survive than when there's competition."

---

[11] M. Rinde, *Consolidation Ripples Out From Florida*, ONCLIVE (Dec. 29, 2016), *available at* http://www.onclive.com/publications/oncology-business-news/2017/january-2017/consolidation-ripples-out-from-florida (last accessed Mar. 21, 2018).

[12] M. Rinde, *Consolidation Ripples Out From Florida*, ONCLIVE (Dec. 29, 2016), *available at* http://www.onclive.com/publications/oncology-business-news/2017/january-2017/consolidation-ripples-out-from-florida (last accessed Mar. 21, 2018).

[13] M. Rinde, *Consolidation Ripples Out From Florida*, ONCLIVE (Dec. 29, 2016), *available at* http://www.onclive.com/publications/oncology-business-news/2017/january-2017/consolidation-ripples-out-from-florida (last accessed Mar. 21, 2018).

### 1.     Whistleblower Complaint

29.     On January 4, 2017, two former employees of FCS filed a whistleblower

action alleging that beginning in 2010, 21st Century and FCS submitted false claims to

the United States government healthcare programs, Medicare and Medicaid, and engaged

in a *quid pro quo* kickback scheme in violation of the Sherman Antitrust Act, 15 U.S.C.

§§ 1 – 7.

30.     During the conspiracy, whistleblower Sharon Dill ("Dill") served as FCS's

Vice President, Human Resources and Chief Human Resources Officer from January 23,

2012 until November 10, 2015. Christina Sievert ("Sievert") served as FCS's President of

Clinical Financial Services from October 2013 until October 1, 2015.

31.     Dill and Sievert claim they obtained direct knowledge through their

employment at FCS that Dr. William Harwin, President of FCS, colluded and conspired

with Dr. Daniel Dosoretz, former Chief Executive Officer of 21st Century, to formulate

and carry out a so-called "gentleman's agreement," which ensured that 21st Century and

FCS would not compete in the market for Oncology Services in Southwest Florida.

32.     Specifically, the Whistleblower Complaint asserts that FCS and 21st

Century agreed to a quid pro quo scheme whereby 21st Century would exclusively refer

its Medical Oncology patients to FCS and, in return, FCS would refer its Radiation

Oncology patients exclusively to 21st Century. Dill and Sievert allegedly observed first-

hand that FCS staff members were instructed to send any cancer patients who needed

Radiation Oncology in Southwest Florida to 21st Century. In return, Dill and Sievert

observed that 21st Century referred all of their Medical Oncology patients in Southwest Florida to FCS.

33.     Additionally, according to Dill and Sievert, a new provider, Premiere Oncology opened in Southwest Florida in 2011. Specifically, Premiere Oncology provided Medical Oncology, Radiation Oncology and urology services. However, Premiere Oncology struggled to attract patients, and was ultimately forced to sell its business.  To prevent the sale of Premiere Oncology from generating new competition, Dill and Sievert allege that FCS and 21st Century entered into a new agreement, whereby 21st Century would purchase Premiere Oncology's Radiation Oncology practice and FCS would purchase Premiere Oncology's Medical Oncology practice.

34.     Dill and Sievert's allegations led to an investigation by the DOJ into anticompetitive conduct by FCS and 21st Century.

35.     Plaintiff and members of the Class did not know and could not have known of the existence of the anticompetitive conduct alleged herein until June 29, 2017, at the earliest, the date in which Dill and Sievert's whistleblower action was disclosed by 21st Century as part of a federal bankruptcy proceeding.

36.     Because Defendants' agreements were kept secret until at least June 29, 2017, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Oncology Services in Southwest Florida during the Class Period.

2.    **The Structure and Characteristics of The Market For Oncology Services in Southwest Florida Supports The Existence of a Conspiracy**

37.    The structure and other characteristics of the market for Oncology Services in Southwest Florida make it conducive to anticompetitive conduct among Defendants, and make collusion particularly attractive. Specifically, the Oncology Services market in Southwest Florida (1) is highly concentrated; (2) has high barriers to entry; (3) is comprised of participants who had ample opportunities to conspire; and (4) is inelastic. Additionally, facts exist that are highly indicative of anticompetitive and monopolistic behavior, including the fact that prices for Oncology Services in Southwest Florida were artificially inflated, whereas in truly competitive geographic markets, prices remained lower.

a.    **The Market For Oncology Services Is Highly Concentrated**

38.    A highly-concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

39.    The Oncology Services market in Southwest Florida is highly concentrated and dominated by 21st Century and FCS. The market share and financial resources of non-defendant health care providers of Oncology Services is small. Through acquisitions and industry consolidation, 21st Century and FCS have increased their market power and reduced the ability of other providers of Oncology Services to compete for patients served by 21st Century and FCS.

40.    According to government data, Defendants control nearly 90% of the market for Oncology Services in Southwest Florida:

12



41.    Within the narrower submarket for Radiation Oncology services in
Southwest Florida, 21st Century maintains an 85% market share.

42.    FCS, meanwhile, maintains a 92% market share in the submarket for
Medical Oncology services in Southwest Florida.

43.    The Herfindahl–Hirschman Index ("HHI") measures the competitive
concentration of a particular industry. An HHI of 0 indicates a perfectly competitive
market. The higher the number, the less competitive the market. Figure 5 below provides
the ranges of HHI concentration levels used by the U.S. Department of Justice and FTC
to classify markets as unconcentrated, moderately concentrated, and highly concentrated.
The higher the market concentration, the higher the monopolistic power.

**Figure 5**

**Concentration Levels**

| Level | HHI |
|---|---|
| Highly Concentrated | > 2,500 |
| Moderately Concentrated | 1,500 to 2,500 |
| Unconcentrated | < 1,500 |

44.     The HHI for the Oncology Services market in the affected area, Southwest
Florida, is 4,018. Thus, the Oncology Services market in Southwest Florida is highly
concentrated and conducive to anticompetitive behavior.

45.     So too are the respective submarkets for Medical Oncology and Radiation
Oncology services in Southwest Florida. The market for Medical Oncology services in
Southwest Florida, which FCS dominates, has an HHI of 8,580. The market for Radiation
Oncology services in Southwest Florida, which 21st Century dominates, has an HHI of
7,476.

46.     Because of 21st Century and FCS' concentrated market power, their
concerted actions had the ability to, and did in fact, impact pricing for Oncology Services
in Southwest Florida during the Class Period.

47.     There was no reasonable threat that 21st Century and FCS' fringe
competitors, who were not parties to the Defendants' "gentleman's agreement," could
undercut 21st Century and FCS' artificially inflated pricing and meet all or a significant
portion of market demand for Oncology Services in Southwest Florida.

14

### i.    The Anticompetitive Effects of Defendants' Supracompetitive Pricing

48.    Defendants' scheme to collusively manipulate and control the Oncology Services market in Southwest Florida had the purpose and effect of artificially raising prices of Oncology Services to supracompetitive levels.

49.    Indeed, according to data gathered comparing Palm Beach County (located outside the relevant geographic market)[14] and Lee County (located within the relevant geographic market), prices for Oncology Services in 2015 were dramatically higher in Lee County. The figure below reflects the average cost of care for Oncology Services in these counties.



50.    In fact, prices for Medical Oncology services in Lee County were 62% higher than prices in Palm Beach County in 2015. Prices for Radiation Oncology services were 34% higher in Lee County than in Palm Beach County in 2015.

---

[14] Palm Beach County is demonstratively used in this example because Defendants compete there for both Medical and Radiation Oncology.

51.     Due to Defendants' anticompetitive behavior, Plaintiff and members of the

Class paid artificially inflated prices for Oncology Services.

> **b.    Defendants' Conduct Went Against Their Respective Economic Self-Interests, Absent an Agreement To Divide the Market**

52.     21st Century and FCS compete in the market for Oncology Services

outside of Southwest Florida.

53.     The following map illustrates the direct competition for Oncology

Services in other regions of Florida, compared to the complete lack of such competition

in Southwest Florida:



The Market for Oncology Services in Florida

54.    While 21st Century and FCS have engaged in a series of acquisitions and aggressive growth strategies over the last decade in other parts of Florida, those efforts conspicuously avoided any overlap in Southwest Florida.

55.    FSC's CEO, Brad Prechtl boasts that "[w]hen [he] joined FCS in 2009, [they] had about 65 physicians in the practice, 800+ employees and under 30 offices, located exclusively along the Gulf Coast. In the past five years, [FCS] ha[s] tripled in size to approximately 180 physicians, 2100 employees and over 80 locations throughout Florida."[15] Similarly, 21st Century began a single center in 1989 and now markets itself as "the largest physician-led operator of radiation treatment centers in the world, [w]ith 179 centers in 16 U.S. states and six Latin American countries; the company is more than three times larger than its closest competitor."[16] This growth occurred exclusively outside of Southwest Florida.

56.    Within Southwest Florida, FCS's lack of growth into the Radiation Oncology market, coupled with 21st Century's lack of growth into the Medical Oncology market can only be explained by the existence of their unlawful market allocation agreement.

57.    21st Century and FCS' acquisition of Premiere Oncology further underscores this point. In a rational competitive market, the sale of Premiere Oncology would have presented an attractive opportunity for either 21st Century or FCS to expand

---

[15] Cision PR Web, *CEO Bradley Prechtl Marks Six Years of Unprecedented Growth At Florida Cancer Specialists & Research Institute*, PR WEB (Apr. 14, 2015) *available at* http://www.prweb.com/releases/2015/03/prweb12575550.htm (last accessed on Mar. 21, 2018)
[16] *Business Observer: Bigger and better*, 21ST CENTURY ONCOLOGY (Mar. 7, 2014), *available at* https://www.21co.com/leecounty/news/business-observer-bigger-and-better (last accessed on Mar. 21, 2018).

17

into the other market (*i.e.*, for FCS to expand into the Radiation Oncology market in Southwest Florida, or for 21st Century to expand into the Medical Oncology market in Southwest Florida). Instead, Defendants used the opportunity to reinforce their existing market allocation agreement and further strengthen their monopoly power in each respective product market.

> c.   **The Market For Oncology Services Has High Barriers To Entry**

58.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartels and market-allocation agreements.

59.   This is particularly true here because providing Oncology Services is capital intensive. Economic and operational pressures make it difficult for smaller oncology practices to operate independently and larger hospitals have greater leverage against manufacturers and third-party payers than office-based practices.[17] Moreover, Oncology Service providers need qualified physicians and access to sophisticated diagnostic equipment, which necessitates substantial capital.

60.   Therefore, it would require considerable funding and time for a potential market entrant to gain the economies of scale and patient base achieved by 21st Century and FCS necessary to compete in the market for Oncology Services.

---

[17] See e.g. Matthew Cook and Sebastian Morisot, *Oncology: Still an Attractive Market?*, PHARMEXEC (May 13, 2014), http://www.pharmexec.com/oncology-still-attractive-market.

18

#### d.    Defendants Had Opportunities To Conspire

61.    Defendants had numerous opportunities to meet and conspire under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the conspiracy. In particular, Defendants are members of the same trade organizations, which afforded them the opportunity to meet and discuss the anticompetitive agreement.

62.    Defendants (including, their agents and/or employees) are both members of the Florida Society of Clinical Oncology, American Society of Clinical Oncology, American College of Radiation, and American College of Radiation Oncology.[18]

63.    Defendants (including, their agents and/or employees) attend the same industry conferences, including the annual meetings of the American Society for Radiation Oncology[19] and the Business Summits of the Cancer Center.[20]

64.    Moreover, the sheer proximity of FCS and 21st Century permitted them easy access to meet and conspire, as they are headquartered within 2.5 miles of each other in Fort Myers, Florida.[21]

---

[18]*Daniel C. Dorosetz, MD, FACR, FACRO*, 21ST CENTURY ONCOLOGY, *available at* https://www.21co.com/leecounty/physicians/dosoretz-daniel-e (last accessed Mar. 21, 2018); *William N. Harwin, M.D.*, FLORIDA CANCER SPECIALISTS AND RESEARCH INSTITUTE, *available at* https://www.flcancer.com/en/physician/william-n-harwin-md/ (last accessed Mar. 21, 2018).
[19] *Leading Radiation Oncologists Chosen to Present at Annual Conference*, 21ST CENTURY ONCOLOGY (Sept. 24, 2015), *available at* https://arizona.21co.com/local/news/leading-radiation-oncologists-chosen-to-present-at-annual-conference-2015 (last accessed Mar. 21, 2018); *Janelle Park, MC and Yuenan Wang, PhD to Present Abstracts at ASTRO's National Meeting*, FLORIDA CANCER SPECIALISTS & RESEARCH INSTITUTE (Jun. 4, 2015), *available at* https://flcancer.com/en/articles/janelle-park-md-and-yuenan-wang-phd-present-abstracts-astros-national-meeting/ (last accessed Mar. 21, 2018).
[20] *Oncology Care Transformation: What's Working and What Lies Ahead*, CANCER CENTER BUSINESS SUMMIT, *available at* http://www.cancerbusinesssummit.com/2016SummitBrochure.pdf (last accessed Mar. 22, 2018).
[21] *Company Overview of Florida Cancer Specialists & Research Institute*, BLOOMBERG, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4281536 (last accessed Mar.

### e.     The Demand For Oncology Services Is Inelastic

65.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

66.     For an antitrust conspirator to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

67.     Demand for Oncology Services is highly inelastic. A small, non-transitory increase in the price for Oncology Services would not cause purchasers to switch to other treatment options in significant enough numbers to negate the value to sellers of the price increase.

68.     This is because Oncology Services are essential in the diagnosis and treatment of cancer.

---

20, 2018); *Welcome to 21st Century Oncology*, 21ST CENTURY ONCOLOGY, *available at* https://www.21co.com/overview (last accessed Mar. 21, 2018).

69.    There are no adequate alternatives to Oncology Services for patients seeking care before or after a cancer diagnosis. Other medical and non-medical options cannot replace Oncology Services in the diagnosis and treatment of cancer.

## CLASS ACTION ALLEGATIONS

70.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States who paid for all or a portion of the cost of Oncology Services in Southwest Florida directly to 21st Century or FCS, or any current or former subsidiary or affiliate of either 21st Century or FCS, or any co- conspirator, during the period from and including 2010 until the effects of Defendants' unlawful conduct ceases. Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

71.    While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the class size is numerous given FCS's and 21st Century's substantial presence in Southwest Florida.

72.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

(a)   Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of Oncology Services;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated Section 1 of the Sherman Act, as alleged in the First Count;

(e)   Whether the alleged conspiracy to monopolize violated Section 2 of the Sherman Act, as alleged in the Second Count;

(f)   Whether the alleged monopoly by 21st Century violated Section 2 of the Sherman Act, as alleged in the Third Count;

(g)   Whether the alleged monopoly by FCS violated Section 2 of the Sherman Act, as alleged in the Fourth Count;

(h)   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(i)   The effect of the alleged conspiracy on the cost of Oncology Services in Southwest Florida during the Class Period;

(j)   Whether the Defendants and their co-conspirators fraudulently concealed the existence of their anticompetitive conduct from the Plaintiff and the members of the Class;

22

(k)     The appropriate injunctive and related equitable relief for Plaintiff
        and the Class; and

(l)     The appropriate class-wide measure of damages.

73.     Plaintiff's claims are typical of the claims of the members of the Class,
and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all
members of the Class are similarly affected by Defendants' unlawful conduct in that they
paid artificially inflated prices for Oncology Services provided by Defendants and/or
their co-conspirators.

74.     Plaintiff's claims arise out of the same common course of conduct giving
rise to the claims of the other members of the Class. Plaintiff's interests are coincident
with, and not antagonistic to, those of the other members of the Class. Plaintiff is
represented by competent counsel who are experienced in the prosecution of antitrust and
class action litigation.

75.     The questions of law and fact common to the members of the Class
predominate over any questions affecting only individual members, including legal and
factual issues relating to liability and damages.

76.     Class action treatment is a superior method for the fair and efficient
adjudication of the controversy, in that, among other things, such treatment will permit a
large number of similarly situated persons to prosecute their common claims in a single
forum simultaneously, efficiently and without the unnecessary duplication of evidence,
effort and expense that numerous individual actions would engender. The benefits of
proceeding through the class mechanism, including providing injured persons or entities

23

with a method for obtaining redress for claims that it might not be practicable to pursue

individually, substantially outweigh any difficulties that may arise in management of this

class action.

77.    The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications, establishing incompatible

standards of conduct for Defendants.

**PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY**

78.    Defendants' antitrust conspiracy, conspiracy to monopolize, attempted

monopolization, and monopolization had the following effects, among others:

> (a)    Price competition has been restrained or eliminated with respect to
>        Oncology Services;
>
> (b)    The prices of Oncology Services have been fixed, raised,
>        maintained, or stabilized at artificially inflated levels;
>
> (c)    Purchasers of Oncology Services have been deprived of the
>        benefits of free and open competition; and
>
> (d)    Purchasers of Oncology Services paid artificially inflated prices.

79.    The purpose of the conspiratorial and unlawful conduct of Defendants and

their co-conspirators was to fix, raise, stabilize and/or maintain the price of Oncology

Services in Southwest Florida.

80.    The precise amount of the overcharge impacting the prices of Oncology

Services paid by Plaintiff and the Class can be measured and quantified using well-

accepted models.

81.    By reason of the alleged violations of the antitrust laws, Plaintiff and the members of the Class have sustained injury to their businesses or property, having paid higher prices for Oncology Services than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, conspiracy to monopolize, and monopolization, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FIRST COUNT
### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)
### (Conspiracy in Restraint of Trade)

82.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

83.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

84.    The acts done by each Defendant, which were part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

85.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Oncology Services.

86.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Oncology Services.

25

87.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated members of the Class have been harmed by being forced to pay inflated, supra-competitive prices for Oncology Services.

88.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

89.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Oncology Services has been restrained, suppressed, and/or eliminated in Southwest Florida;

(b)    Prices for Oncology Services provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout Southwest Florida; and

(c)    Plaintiff and members of the Class who purchased Oncology Services from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

90.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Oncology Services purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

91.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

92.     Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND COUNT**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**(Conspiracy to Monopolize)**

93.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

94.     Beginning at least as early as 2010, and continuing thereafter, until the effects of their unlawful conduct ceases, Defendants entered into and participated in an unlawful agreement to monopolize the Southwest Florida Oncology Services market through the exclusionary, anticompetitive conduct set forth above, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants acted pursuant to their unlawful agreement and conspired to do so with the specific intent of monopolizing the Southwest Florida Oncology Services market.

95.     As a result of the conspiracy, Defendants effectively excluded competition from a significant, substantial portion of the Southwest Florida Oncology Services market, unlawfully expanded and maintained 21st Century and FCS dominant market share in the Southwest Florida Oncology Services market, and profited from their anticompetitive conduct by maintaining prices at artificially high, supracompetitve levels and otherwise reaping the benefits of their illegally obtained and maintained monopoly power.

27

96.    There is no legitimate business justification for the anticompetitive actions of Defendants and the conduct through which they acquired and maintained monopoly power in the Southwest Florida Oncology Services market. The anticompetitive effects of the conduct of Defendants far outweigh any conceivable pro-competitive benefit or justification. Even if such justification had existed, any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

97.    As a direct and proximate result of the anticompetitive combination, contract, conspiracy, and agreement of Defendants, Plaintiff and Class members have been injured in their business and property. Plaintiff and Class members have paid higher, artificially inflated prices for Oncology Services than they otherwise would have paid absent Defendants' conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

98.    Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## THIRD COUNT
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) By 21st Century and Dr. Daniel Dosoretz (Monopolization, Attempted Monopolization, and Conspiracy to Monopolize the Radiation Oncology Services Market)**

99.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

100.    21st Century and its former CEO, Dr. Daniel Dosoretz, has monopolized, attempted to monopolize, and with FCS and its President Dr. William N. Harwin, conspired to monopolize, the Radiation Oncology services market in Southwest Florida.

28

101.    As alleged herein, 21st Century has monopoly power in the Radiation Oncology services market in Southwest Florida, including the power to control prices and exclude competition.

102.    21st Century and its former CEO, Dr. Daniel Dosoretz, has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

103.    21st Century and its former CEO, Dr. Daniel Dosoretz, has unreasonably restrained, and further threatens to unreasonably restrain competition in the Radiation Oncology services market in Southwest Florida by entering into an unlawful exclusive referral agreement with FCS and its President Dr. William N. Harwin, that restrains market entry, excludes competitors, limits access to Radiation Oncology services, and raises prices.

104.    As a direct and proximate result of 21st Century and its former CEO, Dr. Daniel Dosoretz's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things: (i) 21st Century's ability to charge supracompetitive prices for Radiation Oncology services; and (ii) the limitation of accessibility to Radiation Oncology services in Southwest Florida.

## FOURTH COUNT
### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2) By FCS and Dr. William N. Harwin
### (Monopolization, Attempted Monopolization, and Conspiracy to Monopolize the Medical Oncology Services Market)

105.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

106.    FCS and its President Dr. William N. Harwin, has monopolized, attempted to monopolize, and with 21st Century and its former CEO, Dr. Daniel Dosoretz, conspired to monopolize, the Medical Oncology services market in Southwest Florida.

107.    FCS, as alleged herein, has monopoly power in the Medical Oncology services market in Southwest Florida, including the power to control prices and exclude competition.

108.    FCS and its President Dr. William N. Harwin, has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

109.    FCS and its President Dr. William N. Harwin, has unreasonably restrained, and further threatens to unreasonably restrain competition in the Medical Oncology services market in Southwest Florida by entering into an unlawful exclusive referral agreement with 21 Century its former CEO, Dr. Daniel Dosoretz that restrains market entry, excludes competitors, limits access to Medical Oncology services, and raises prices.

110.    As a direct and proximate result of FCS and its President Dr. William N. Harwin's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things: (i) FCS's ability to charge supracompetitive prices for Medical Oncology services; and (ii) the limitation of accessibility to Medical Oncology services in Southwest Florida.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully request the following relief:

(a)     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

(b)     That as to the First Claim for Relief, the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed to be:

               i.     an unlawful unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

               ii.     a *per se* violation of Section 1 of the Sherman Act;

(c)     That as to the Second Claim for Relief, the Defendants' conspiracy to monopolize the Oncology Services market alleged herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act;

(d)     That as to the Third Claim for Relief, 21st Century and its former CEO, Dr. Daniel Dosoretz's attempted monopolization, and/or conspiracy to monopolize and monopolization of the Radiation Oncology services market alleged herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act;

(e)     That as to the Fourth Claim for Relief, FCS and its President Dr. William N. Harwin's attempted monopolization, and/or conspiracy to monopolize, and monopolization of the Medical Oncology services  market alleged herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act;

31

(f)     Plaintiff and the members of the Class recover damages, to the maximum extent allowed under the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

(g)     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing or maintaining the monopolies alleged herein or continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

(h)     Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

(i)     Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

(j)     Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

32

Dated:  March 26, 2018

Respectfully submitted,

By: */s/ Lawrence A. Farese*
Florida Bar No: 252808
**ROBINS KAPLAN LLP**
711 Fifth Avenue South
Suite 201
Naples, FL 34102
(239) 430-7070
*lfarese@robinskaplan.com*

Hollis Salzman
Kellie Lerner
**ROBINS KAPLAN LLP**
399 Park Avenue
Suite 3600
New York, NY 10022
(212) 980-7400
*hsalzman@robinskaplan.com*
*klerner@robinskaplan.com*

K. Craig Wildfang
**ROBINS KAPLAN LLP**
800 LaSalle Avenue
Suite 2800
Minneapolis, MN 55402
(612) 349-8500
*kcwildfang@robinskaplan.com*

Michael D. Fitzgerald
**LAW OFFICES OF MICHAEL D.**
**FITZGERALD**
1 Industrial Way West
Building B
Eatontown, NJ 07724
(732) 223-2200
*Mdfitz@briellelaw.com*

33