# EXHIBIT B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| COUNTY OF MONMOUTH, NEW JERSEY, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FLORIDA CANCER SPECIALISTS, P.L.; AND DR. WILLIAM N. HARWIN,<br><br>Defendants. | Case No. 2:18-cv-201-SDM-MRM<br><br>**DECLARATION OF BRIAN PINKERTON REGARDING NOTICE AND SETTLEMENT ADMINISTRATION** |

### DECLARATION OF BRIAN PINKERTON

I, Brian Pinkerton, declare as follows:

1. I am a Senior Project Manager for Epiq Class Action & Claims Solutions, Inc. ("Epiq") an international settlement and claims administration firm with offices in Chicago, Dallas, Hartford, Hong Kong, Kansas City, London, Los Angeles, Miami, New York, Oklahoma City, Phoenix, Portland, Tokyo, Washington, D.C., and Wilmington, Delaware. My business address is 1201 Third Avenue, Suite 500, Seattle, Washington 98101The following statements are based on my personal knowledge and information provided by other Epiq employees working under my supervision, and if called on to do so, I could and would testify competently about these issues.

2. Epiq was selected by the Parties and appointed as the settlement administrator in the above captioned class action by the Court's Order dated June 5, 2019, which granted preliminary approval to the Settlement (the "Order")[1]. I submit this declaration to advise the Parties and the Court regarding the implementation of the Court-approved notice plan and to report on Epiq's handling to date of the settlement administration, in accordance with the Order.

---
[1] All capitalized terms not otherwise defined in this document shall have the same meaning ascribed to them in the Settlement Agreement.

1
DECLARATION

3. Under the terms of the Settlement Agreement (the "Agreement"), Epiq's duties as settlement administrator include, but are not limited to disseminating direct notice of the proposed settlement to Settlement Class Members; publishing notice of the proposed settlement in two print newspapers with distribution across Southwest Florida; receiving and processing requests for exclusion from the settlement; and calculating and distributing settlement award checks to Settlement Class Members in accordance with the terms of the Agreement, the proposed Plan of Allocation, and orders of the Court.

**DATA TRANSFER**

4. In accordance with the Order, on June 12, 2019, Class Counsel provided Epiq with data files containing contact information and payment data relating to health plans and individuals identified by 21st Century Oncology LLC as Settlement Class Members via a secure file transfer site.

5. Also in compliance with the Order, on June 17, 2019, Counsel for Defendants provided Epiq with two excel data files containing contact information and payment data for health plans and patients identified by Florida Cancer Specialists & Research Institute, LLC, f/k/a Florida Cancer Specialists, P.L. ("FCS") as Settlement Class Members via a secure file transfer site.

6. Epiq worked with the Parties between June 17, 2019 and July 22, 2019, to confirm criteria for identifying potential duplicate entries within each file and across the various excel files, and confirm contact information for Settlement Class Members.

7. Epiq standardized the address data and ran all addresses through the National Change of Address database maintained by the U.S. Postal Service to ensure that the mailing addresses provided were as current as possible. Epiq also de-duplicated the lists of Settlement Class Members by combining the records where the first name, middle name, last name, and addresses were identical.

8. Epiq loaded all of the data relating to Settlement Class Members (the "Class Data") into a secure, dedicated database created for the purpose of administration of the proposed settlement (the "Settlement Database"). Epiq assigned unique identifiers to all the records it received in order to maintain the ability to track them throughout the settlement administration

process. After combining and de-duplicating the data provided by the Parties, there were 94,595 distinct Settlement Class Member records loaded into the Settlement Database.

### DISSEMINATION OF DIRECT NOTICE AND PUBLICATION

9. In compliance with the Order, Epiq mailed the Court-approved Notice to the 94,583[2] Settlement Class Members with valid mailing addresses on July 22, 2019. Attached hereto as **Attachment 1** is a copy of the Court-approved notice that Epiq disseminated to Settlement Class Members.

10. As of September 6, 2019, Epiq has mailed 38 additional copies of the Court-approved notice to individuals who were not identified in the Class Data but to have a copy of the notice mailed to them.

11. As of September 6, 2019, Epiq has received only 17 notices returned by the Post Office with forwarding addresses. When Epiq receives a notice returned by the Post Office with a forwarding address, Epiq promptly updates the address in the Settlement Database and re-mails the notice to the updated address.

12. As of September 6, 2019, Epiq has received 1,209 notices returned by the Post Office as undeliverable. Epiq will be performing skip trace address searches for each Settlement Class Member whose notice was undeliverable, and will re-mail notices to all Settlement Class Members for whom a more current address can be located.

13. In compliance with the Order, Epiq caused notice of the proposed settlement to be published in both the *Fort Myers News-Press* and the *Sarasota Herald Tribune* beginning on July 25, 2019. The newspaper insertions ran in each publication on both Thursday, July 25, 2019 and on Sunday, July 28, 2019. Attached hereto as **Attachment 2** are true and correct copies of the four newspaper insertions of the Court-approved publication notice.

### SETTLEMENT WEBSITE

14. In accordance with the Agreement and the Court-approved notice, on July 19, 2019, Epiq launched a settlement website, www.FCSClassAction.com, that Settlement Class Members

---

[2] Of the 94,595 Settlement Class Members, Epiq was unable to mail notice to 12 because they did not have a valid mailing address.

can visit to obtain additional information about the proposed settlement, as well as view important documents, including the Court-approved notice, Settlement Agreement, First Amendment to the Settlement Agreement, Class Action Complaint, Preliminary Approval Order and proposed Plan of Allocation. The application for attorneys' fees, costs, and expenses, and incentive award to Plaintiff will also be posted to the settlement website once it has been filed. The settlement website contains a summary of options available to Settlement Class Members, deadlines to act, and answers to frequently asked questions. Additionally, Settlement Class Members can contact Epiq through email forms on the settlement website in order to register to be notified when the application for attorneys' fees is filed, to confirm whether they are members of the Settlement Class, or to notify Epiq that their address has changed. The settlement website is available 24 hours per day, seven days per week.

15. As of August 30, 2019, the settlement website has been visited 3,453 times and 10,306 website pages have been viewed. Epiq has maintained and will continue to maintain and update the settlement website throughout the administration of the proposed settlement.

### TOLL-FREE INFORMATION LINE

16. In accordance with the Agreement and the Court-approved notice, Epiq established and is maintaining a toll-free interactive Voice Response Unit ("VRU"), 1-888-509-2623, to provide information to Settlement Class Members. Callers hear an introductory message and then are provided with scripted information about the Settlement in the form of recorded answers to frequently asked questions. Callers also have the option to speak with a live agent during business hours if they have additional questions about the proposed settlement. The toll-free number was included in the notice sent to Settlement Class Members, and the automated telephone system is available 24 hours per day, 7 days per week.

17. As of August 30, 2019, the toll-free number has received 3,612 calls representing 34,044 total minutes. Additionally, there have been 1,942 calls resulting in requests to speak to live operators for a total of 19,221 minutes on the phone with agents. Epiq has and will continue to maintain and update the toll-free information line and VRU throughout the settlement administration process.

## REQUESTS FOR EXCLUSION

18. Pursuant to the terms of the Agreement as well as the Court-approved notice, Settlement Class Members who wish to be excluded from the Settlement must submit a written request to opt out of the settlement no later than September 20, 2019.

19. As of September 6, 2019, Epiq has received 41 requests for exclusion from Settlement Class Members. Epiq expects that additional timely requests for exclusion may be received prior to the September 20, 2019 deadline.

## OBJECTIONS

20. Pursuant to the Order and the procedures described in the Court-approved notice, Settlement Class Members who do not exclude themselves from the settlement may object to the settlement by submitting a written objection to the Court and the settlement administrator by no later than September 30, 2019. As of September 6, 2019, Epiq has not yet received any objections from Settlement Class Members, although Epiq is aware that one objection has been filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is information true and correct.

Executed this 6th day of September 2019, at Seattle, WA.

_____
Brian Pinkerton

# Attachment 1

# If You Received Cancer Treatment from Florida Cancer Specialists & Research Institute, LLC, or 21st Century Oncology LLC in Southwest Florida between January 1, 2010 and June 5, 2019, <u>You Could Receive Money from a Settlement Totaling up to $7.1875 Million</u>

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

- Please read this Notice and the Settlement Agreement available at www.FCSClassAction.com carefully. Your legal rights may be affected whether you act or don't act. This Notice is a summary, and is not intended to, and does not, include all the specific details of the Settlement Agreement. To obtain more specific details concerning the Settlement, please read the Settlement Agreement.

- A lawsuit claiming that Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS" or the "Settling Defendants") entered into agreements with 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") that unlawfully raised the prices for cancer diagnosis and treatment ("Oncology Services") in certain Florida counties has been settled. FCS denies that it engaged in any wrongdoing, but has agreed to settle. This Notice will give you details of the proposed Settlement Agreement and your rights in this lawsuit.

- Generally, you may be included in the Settlement Class if, at any time between January 1, 2010 and June 5, 2019, you paid directly for any portion of the cost of Oncology Services in Charlotte, Collier, Lee, Manatee, or Sarasota Counties, Florida (collectively, "Southwest Florida") to either FCS or 21st Century, or any of their current or former subsidiaries or affiliates. To find out if you qualify (or anyone to whom you are directed by the Court to provide this Notice qualifies (see Question 9 below)), go to www.FCSClassAction.com or call 1-888-509-2623.

- As more fully described in Question 8 below, the Settling Defendants have agreed to pay up to $7,187,500 to be made available to persons and entities who paid directly for any part of the cost of Oncology Services in Southwest Florida during the relevant period.

| YOUR LEGAL RIGHTS AND OPTIONS | | |
|---|---|---|
| **Exclude Yourself** | You will not be included in the Settlement Class if you exclude yourself. You will receive no benefits from the Settlement, but you will keep any rights you currently have to sue these Settling Defendants about the claims in the Settlement Class from which you exclude yourself. | September 20, 2019 |
| **Object to the Settlements and Plan of Allocation** | If you do not exclude yourself, you can write to the Court explaining why you disagree with the Settlement or the Plan of Allocation. | September 30, 2019 |
| **Go to the Hearing** | If you submit a written objection, you may ask to speak in Court about your opinion of the Settlement. | October 29, 2019 |

Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com

1

- These rights and options—and the deadlines to exercise them—are explained in this Notice.
- The Court in charge of this case still has to decide whether to finally approve the Settlement. Payments will only be made if the Court approves the Settlement and a Plan of Allocation, and after any appeals are resolved.

## WHAT THIS NOTICE CONTAINS

**Basic Information** ............................................................................................................................3

   1. Why Is There a Notice? ............................................................................................................ 3

   2. What Is This Lawsuit About? ................................................................................................... 3

   3. Who Are the Settling Defendants? ........................................................................................... 3

   4. Are There Non-Settling Defendants? ........................................................................................ 3

   5. Why Is This a Class Action? .................................................................................................... 3

**Who Is Included in the Class** ...........................................................................................................4

   6. How Do I Know If I May Be Included in the Settlement Class? ............................................ 4

   7. Who Is Not Included in the Settlement Class? ........................................................................ 4

**The Settlement's Benefits** ................................................................................................................4

   8. What Does the Settlement Provide? ......................................................................................... 4

**How to Get Benefits**.........................................................................................................................5

   9. How Do I Receive My Payment? ............................................................................................ 5

   10. How Much Money Can I Get? ............................................................................................... 5

   11. When Will I Get a Payment? ................................................................................................. 5

   12. What Happens If I Remain in the Settlement Class? ............................................................. 6

**Excluding Yourself from the Class** .................................................................................................6

   13. How Do I Get Out of the Settlement Class? .......................................................................... 6

   14. If I Don't Exclude Myself, Can I Sue for the Same Thing Later? ........................................ 6

   15. If I Exclude Myself, Can I Still Get Money Benefits? .......................................................... 6

**The Lawyers Representing You**......................................................................................................6

   16. Do I Have a Lawyer Representing Me? ................................................................................. 6

   17. How Will the Lawyers Be Paid? ............................................................................................ 7

**Objecting to the Settlement** ............................................................................................................7

   18. How Do I Object to or Comment on the Settlement? ............................................................ 7

   19. What Is the Difference Between Excluding Myself from the Settlement Class and Objecting to the Settlement? .................................................................................................. 8

**The Final Fairness Hearing** ............................................................................................................8

   20. When and Where Will the Court Decide Whether to Approve the Settlement? ................... 8

   21. Do I Have to Attend the Hearing? .......................................................................................... 8

**Get More Information** .....................................................................................................................8

   22. How Do I Get More Information? .......................................................................................... 8

**Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com**

# BASIC INFORMATION

## 1. Why Is There a Notice?

This Notice is to inform you about the Settlement reached in this litigation, before the Court decides whether to finally approve the Settlement.

The Court in charge is the United States District Court for the Middle District of Florida. This litigation is known as *County of Monmouth v. Florida Cancer Specialists, P.L., et al*., Case No. 2:18-CV-201 (M.D. Fla.). The entity that sued is called the "Plaintiff." The entities they sued are called the "Defendants."

This Notice explains the lawsuit, the proposed Settlement, and your legal rights, including the ability to receive a payment.

## 2. What Is This Lawsuit About?

This lawsuit claims that FCS had an agreement with 21st Century that allegedly unlawfully raised the price of Oncology Services in Southwest Florida. "Oncology Services" refers to the medical diagnosis and treatment of cancer using medicine ("Medical Oncology") or radiation ("Radiation Oncology"). "Medical Oncology" refers to the diagnosis and treatment of cancer with medicine, including chemotherapy, hormonal therapy, biological therapy, and targeted therapy. "Radiation Oncology" refers to the treatment of cancer with therapeutic radiation. "Southwest Florida" refers to the counties of Charlotte, Collier, Lee, Manatee, and Sarasota in the State of Florida.

Plaintiff alleges that, as a result of the alleged agreement between FCS and 21st Century, patients, insurers, and other entities that paid directly for any part of the cost of Oncology Services in Southwest Florida between January 1, 2010 and June 5, 2019 paid more than they should have. Although the Settling Defendants have agreed to settle, they do not agree that they engaged in any wrongdoing or are liable or owe any money or benefits to Plaintiff or the Settlement Class.

## 3. Who Are the Settling Defendants?

The Settling Defendants are Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS").

## 4. Are There Non-Settling Defendants?

No. 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") are no longer named as Defendants in this lawsuit.

## 5. Why Is This a Class Action?

In class actions, one or more individuals or entities called the "class representative(s)" sue on behalf of themselves and other people or entities with similar claims in the specific class action. All of these individuals or entities together are the "Class" or "Class members." In this lawsuit, there is only one class representative: the County of Monmouth, New Jersey, which paid FCS and 21st Century for Oncology Services provided to qualified members of its employee health benefits plan, and sued FCS on behalf of the entire Class. In a class action, one court may resolve the issues for all Class members, except for those who exclude themselves from the Class.

Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com

3

## WHO IS INCLUDED IN THE CLASS

### 6. How Do I Know If I May Be Included in the Settlement Class?

Generally, you may be included in the Settlement Class if, at any time between January 1, 2010 and June 5, 2019, you paid directly for any part of the cost of Oncology Services (*i.e.*, diagnosis or treatment for cancer using either medicine or radiation) provided by FCS or 21st Century in Southwest Florida (*i.e.*, Charlotte, Collier, Lee, Manatee, or Sarasota Counties).

The Settlement Agreement and the related Complaint are both accessible on the website www.FCSClassAction.com or can be obtained by calling 1-888-509-2623. You will also be able to obtain additional information to learn whether you are a member of the Settlement Class by visiting the website www.FCSClassAction.com and providing details regarding your payment for Oncology Services provided by FCS or 21st Century in Southwest Florida, or by calling 1-888-509-2623.

Payments to members of the Settlement Class will only be made if the Court approves the Settlement and after any appeals from such approval are resolved and in accordance with a Plan of Allocation to distribute the Net Settlement Funds (*see* Questions 8, 11, and 20). The final distribution will be subject to the Court's approval.

### 7. Who Is Not Included in the Settlement Class?

The Settlement Class does not include:

- Any of the Defendants, their officers, directors, employees, parent companies, subsidiaries, and affiliates;
- The legal representatives and heirs or assigns of any Defendant;
- Federal governmental entities and instrumentalities, including Medicare and Medicaid; and
- States and their subdivisions, agencies, and instrumentalities, including Medicaid.

## THE SETTLEMENT'S BENEFITS

### 8. What Does the Settlement Provide?

The Settlement provides a cash payment to Settlement Class members of up to $7,187,500. After deduction of attorneys' fees, notice and settlement administration costs, an incentive award to the class representative (the County of Monmouth), and litigation expenses, as approved by the Court, the Net Settlement Funds will be available for distribution to members of the Settlement Class. The distribution will be *pro rata*; that is, each Class member's share in the Settlement Fund will be proportional to the amount he, she, or it paid to FCS or 21st Century for Oncology Services during the class period. Because some individual Class members' claims may be for very small amounts, a minimum of $5 will be paid to each Class member (subject to certain exceptions in the very unlikely event that the Net Settlement Fund is insufficient to allow such a minimum payment to each claimant).

Any interest earned will be added to the Settlement Fund. More details about the Settlement are provided in the Settlement Agreement, available at www.FCSClassAction.com.

Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com

4

# HOW TO GET BENEFITS

## 9. How Do I Receive My Payment?

You may be entitled to a portion of the Settlement Fund when a distribution is made to members of the Settlement Class. If you exclude yourself from the Settlement Class, you will not receive a payment from those funds.

You do not need to do anything to receive your share, if any, of the Settlement Fund. Each Class member's share of the Settlement Fund will be calculated in accordance with the Plan of Allocation. Checks will be mailed by the Administrator to each Class member that is entitled to a share of the Settlement Fund using the most recent address information available in Defendants' databases as well as other available sources of information. However, if you are no longer a patient of the Defendants and have moved, or you otherwise believe that the address Defendants have on file for you is not accurate, please contact the Administrator at www.FCSClassAction.com or 1-888-509-2623.

If there is anyone whose funds you transmitted to FCS or 21st Century for Oncology Services in Southwest Florida between January 1, 2010 and June 5, 2019 (but you did not transmit your funds along with such funds), you are directed by the Court to provide this Notice to that paying person or entity and confirm to the Administrator that you have given such Notice. Any disputes regarding ownership of a payment from the Settlement pertaining to such funds must be resolved between you and the person or entity to whom you are directed to provide this Notice, and neither the Settlement Class, nor the Settling Defendants, nor either Party's lawyers may be sued or brought into any such dispute, regardless of whether you properly provided this Notice or not.

## 10. How Much Money Can I Get?

At this time, it is unknown how much each Class member will receive. Payments will be based on a number of factors, including at least the total dollar value of payments you made for Oncology Services provided by FCS or 21st Century in Southwest Florida between January 1, 2010 and June 5, 2019 and the total dollar value of such payments by other Class members.

The total amount of the Settlement Fund available for distribution to the Settlement Class may also vary depending on whether some potential Class members exclude themselves, but this cannot be predicted at this time. The Settlement provides that if potential Class members whose payments to FCS and 21st Century exceed a certain threshold amount opt out, the Settlement Fund may be reduced proportionately. On the other hand, if Class members whose total payments are less than the threshold amount opt out, there will be no reduction in the amount of the Settlement Fund, but there may be fewer Class members to share in that amount.

In addition (as noted above), attorneys' fees and litigation expenses, notice and settlement administration costs, and any incentive award to the class representative, as approved by the Court, will be deducted before the Net Settlement Fund is distributed to the Settlement Class. The total amount of these fees and expenses is not yet known, but attorneys' fees will not exceed 30 percent of the amount of the Settlement Fund and litigation expenses will not exceed $100,000. The class representative incentive award, if approved by the Court, will not exceed $2,500.

No money will be returned to the Settling Defendants after the Court finally approves the Settlement.

## 11. When Will I Get a Payment?

Payments may be distributed to members of the Settlement Class after the Court grants final approval to the Settlement and any appeals from such approval is resolved. Appeals can take several years to

Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com

5

conclude. If final approval is granted and no one appeals before the deadline to do so, Plaintiff will ask the Court to approve the distribution of checks to members of the Settlement Class.

### 12. What Happens If I Remain in the Settlement Class?

If the Settlement becomes final, you will give up your right to sue these Settling Defendants on your own for the claims described in the Settlement Agreement, unless you exclude yourself from the Settlement Class.

In return for paying the Settlement amount, the Settling Defendants will be released from claims relating to the alleged conduct involving the cancer diagnosis and treatment services identified in the Settlement Agreement. The Settlement Agreement describes the released claims in detail, so read them carefully since those releases will be binding on you if the Court approves this Settlement. If you have any questions, you can talk to Settlement Class Counsel listed in Question 16 for free, or you can, of course, talk to your own lawyer (at your own expense). The Settlement Agreement and the specific releases are available at www.FCSClassAction.com.

## EXCLUDING YOURSELF FROM THE CLASS

### 13. How Do I Get Out of the Settlement Class?

To exclude yourself from the Settlement Class, you must send a letter by mail stating that you want to be excluded from the Settlement Class in *County of Monmouth v. Florida Cancer Specialists, P.L., et al.*, Case No. 2:18-CV-201 (M.D. Fla.).

Your letter must also include:

- Your name, address, and telephone number;
- Documents reflecting your payment of any part of the cost of Oncology Services provided by FCS or 21st Century in Southwest Florida between January 1, 2010 and June 5, 2019; and
- Your signature.

Any request for exclusion must be mailed to the address immediately below, and must be **received** no later than **September 20, 2019**:

Florida Cancer Specialists Antitrust Settlement Administrator
P.O. Box 3207
Portland, OR 97208-3207

### 14. If I Don't Exclude Myself, Can I Sue for the Same Thing Later?

No. Unless you exclude yourself, you give up any right to sue the Settling Defendants for the claims being released in this litigation.

### 15. If I Exclude Myself, Can I Still Get Money Benefits?

No. If you exclude yourself from the Settlement Class, you will not get any money as a result of the Settlement in this case.

## THE LAWYERS REPRESENTING YOU

### 16. Do I Have a Lawyer Representing Me?

Yes. Settlement Class Counsel represents you and all other members of the Settlement Class:

**Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com**
6

Eamon O'Kelly<br>
Robins Kaplan LLP<br>
399 Park Avenue<br>
Suite 3600<br>
New York, NY 10022

You will not be charged for contacting Robins Kaplan LLP. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 17. How Will the Lawyers Be Paid?

At the upcoming final fairness hearing, Settlement Class Counsel may ask the Court (a) to reimburse them for certain costs and expenses and (b) for attorneys' fees based on their services in this litigation. Any payment to the attorneys will be subject to Court approval, and the Court may award less than the requested amount. The attorneys' fees, costs, and litigation expenses that the Court orders, plus the costs to administer the Settlement, will come out of the Settlement Funds. A request that the Court approve an incentive award to the class representative for prosecuting this lawsuit on behalf of the Class may be made at the same time.

When Settlement Class Counsel's motion for fees, costs, and expenses is filed, it will be available at www.FCSClassAction.com. The motion will be posted on the website at least 30 days before the Court holds a hearing to consider the request.

Register at the website or call 1-888-509-2623 to receive notice when the motion is filed.

## OBJECTING TO THE SETTLEMENT

### 18. How Do I Object to or Comment on the Settlement?

If you have objections to or comments about any aspect of (a) the Settlement, (b) the Plan of Allocation, or (c) the motions by Settlement Class Counsel for attorneys' fees or a class representative incentive award, then you may express your views to the Court. You can only object to or comment on these matters if you do not exclude yourself from the Settlement Class.

To object to or comment on the Settlement, the Plan of Allocation, or the motion for attorneys' fees, you must do so in writing. Your letter must include the following:

- Your name, address, and telephone number;
- Documents reflecting your payment of any part of the cost of Oncology Services provided by FCS or 21st Century in Southwest Florida between January 1, 2010 and June 5, 2019;
- The reasons you object to the Settlement, Plan of Allocation, or motion for attorneys' fees, along with any supporting materials; and
- Your signature.

Any comment or objection must be in writing, mailed to **both** of the addresses listed immediately below, and must be **received** by both the Clerk of the Court and the Administrator, no later than **September 30, 2019**. The addresses are:

| Court | Administrator |
|---|---|
| U.S. District Court for the Middle District of Florida, Fort Myers Division<br>Clerk of the Court<br>2110 First Street<br>Fort Myers, FL 33901 | Florida Cancer Specialists Antitrust Settlement Administrator<br>P.O. Box 3207<br>Portland, OR 97208-3207 |

**Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com**

### 19. What Is the Difference Between Excluding Myself from the Settlement Class and Objecting to the Settlement?

If you exclude yourself from the Settlement Class, you are telling the Court that you do not want to participate in the Settlement. Therefore, you will not be eligible to receive any payment from that Settlement, and you will not be able to object to it. Objecting to the Settlement simply means telling the Court that you do not like something about the Settlement. Objecting does not make you ineligible to receive a payment.

## THE FINAL FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests by Settlement Class Counsel for fees, costs, a class representative incentive award, and expenses. You may attend and you may ask to speak, but you do not have to do so.

### 20. When and Where Will the Court Decide Whether to Approve the Settlement?

The Court will hold a Final Fairness Hearing at 9:30 a.m., on October 29, 2019, at the United States Courthouse, 2110 First Street, Fort Myers, FL 33901, Courtroom 5C. The hearing may be moved to a different date or time without additional notice, so check www.FCSClassAction.com or call 1-888-509-2623 for current information. At this hearing, the Court will consider whether the Settlement and the Plan of Allocation are fair, reasonable, and adequate. If there are objections or comments, the Court will consider them at that time and may listen to people who have asked to speak at the hearing. The Court may also decide how much to pay Settlement Class Counsel. At or after the hearing, the Court will decide whether to approve the Settlement.

### 21. Do I Have to Attend the Hearing?

No. Settlement Class Counsel will answer any questions the Court may have. But you are welcome to attend at your expense. If you send an objection or comment, you do not have to come to the Court to talk about it. As long as you mailed your complete and valid written objection on time, as described above in Question 18, the Court will consider it. You may also hire your own lawyer at your own expense to attend on your behalf, but you are not required to do so.

## GET MORE INFORMATION

### 22. How Do I Get More Information?

This Notice summarizes the Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement and more information about the Settlement at www.FCSClassAction.com. In addition, the full Plan of Allocation will be available at the same website. You also may write with questions to Florida Cancer Specialists Antitrust Settlement Administrator, P.O. Box 3207, Portland, OR 97208-3207 or call the toll-free number, 1-888-509-2623. You should also register at the website to be directly notified of any future settlements and other information concerning this case.

Questions? Call 1-888-509-2623 or visit www.FCSClassAction.com

8

# Attachment 2

# Seat

Continued from Page 3A

That applicant, Liston Bouchette III, of Fort Myers, said the part of the screening of the applicants was delegated because of the large number of appointments pending with the governor's office.

DeSantis decided early in his term to replace some holdover appointees. The Orlando Sentinel has reported that the backlog of appointments has approximately 300 positions.

Bouchette served a brief term as an appointee to the Fort Myers City Council when Michael Flanders resigned. He was not a candidate in the election in which Kevin Anderson was elected.

He expressed interest in a similar type of role on the county commission. Bouchette said he has offered himself as an interim appointee. He said he won't move to Kiker's District 3 to be eligible to run in 2020.

While much of the attention concerning possible appointees has been on a list of 14 applications released by the governor's office, it is unclear whether others are being considered.

Hart said there were about 20 people under consideration. Some may be candidates invited to be among a pool of potential appointees to a variety of posts.

Bouchette said he was recruited to fill out a general application during Gov. Rick Scott's term as one of a pool of people willing to accept such an appointment. He indicated that is how he first came under consideration for county commission

Former County Commissioner John Albion, who served 14 years as a commissioner beginning in 1992, is another applicant from outside the district who applied to fill out the unexpired term while letting others campaign for an open seat in 2020.

Albion agrees with Hart that the delay in making the appointment is understandable, given the hundreds of positions the governor had to film on taking office.

"He was sworn in January first, you have the legislative session, then you have the period to veto (legislation) or not," Albion said. "He has also been proactive and has a lot on his plate."

Others say they are not worried about the delay. Brian Farrar of Estero, a land use consultant who has applied, said he "appreciates the governor taking time to make a proper decision."

Speculation abounds as to whether DeSantis would choose to avoid injecting himself in a Republican primary by appointing someone who would run for the full term.

Appointees don't have to live in the district when appointed by a governor.t They must live in the district to be on the election ballot.

That scenario led to a short-lived first commission tenure for current Commissioner Frank Mann, who was appointed by Gov. Lawton Chiles to a vacant seat after the incumbent District 4 commissioner was indicted. Mann ran the next year a full term from his home District 5 and lost.

DeSantis runs the risk of politically alienating some Republicans by appointing a candidate who becomes the presumed front-runner in a Republican primary that is barely a year away.

### Looking at the applicants

Larry Kiker's widow, Paula, is both an applicant for appointment to the post and an announced candidate for election to a full term and intends to seek election to a full four-year term whether she is appointed or not. She said the decision to run in both races shows here seriousness

"If I wasn't, I wouldn't have been working this hard for the last seven weeks," Kiker said. "I have made a commitment, in my mind that's a check mark in my favor."

She has raised more than $40,000 toward a run. One Democrat, Todd Truax of Bonita Springs, is also a candidate for both the appointment and in the 2020 election.

Dick Anderson, who came within 1 percent of the vote of ousting Kiker in a closed Republican primary, is also applying and intends to give a serious look at running in 2020 if he is not the choice for the post.

"I'm really more concerned about the issues I ran on last time," Anderson said. "All of the things going on in 2016 have gotten worse."

Victoria Peters, an employee of the state Department of Transportation, said she has not heard from the governor's office about the selection but said it is understandable that the appointment is one that takes time.

"I can understand that in making this very important decision he may be working on some other things," she said.

Peters lives in Iona, part of District 3, but is uncertain whether she would run for the full term if appointed.

There is no shortage of scrutiny over potential political pull enjoyed by some candidates may prevail.

Local attorney Matthew Roepstorff, listed Hart as a reference for the appointment.

Roepstorff has not returned phone calls seeking comment on his bid to take an appointed seat on the commission.

Tax Collector Hart agrees with those who believe the delay in the appointment comes because the governor does not want to make an appointment in haste.

"He's very unique," Hart said. "He wants to make sure to get the right candidate for this position."

## STATE BRIEF

### Health system offers free DNA tests for 10,000 Floridians

ORLANDO – An operator of hospitals and doctors' clinics in Florida began offering free DNA testing on Wednesday to 10,000 Floridians in a partnership with a private genomics company.

Researchers at AdventHealth in Orlando say the DNA test screens for an inherited condition that can lead to high cholesterol and heart attacks if left untreated. Participants who screen positive will get a second blood test to confirm the diagnosis, get to talk with a genetic counselor at no charge and be put in touch with a cardiologist.

A similar program in Nevada involving the same genomics company, Helix, has enrolled 30,000 participants. AdventHealth hopes to eventually scale up the project to other parts of its health system, which encompasses 46 hospital campuses and 80,000 workers in nine states, primarily in the South and Midwest.

— Associated Press



**Brian Norris, an officer and spokesperson for the Florida Fish and Wildlife Conservation Commission, discusses manatee zones with the media in the Caloosahatchee River on Wednesday.** ANDREW WEST/THE NEWS-PRESS

# Manatee

Continued from Page 3A

The manatee is listed as threatened by the U.S. Fish and Wildlife Service and is protected by the Endangered Species Act and the Marine Mammal Protection Act.

But they're being killed in large numbers across the state this year.

Boats killed 22 manatees in Lee County through July 19, according to FWC records. That leads the Sunshine State and is more than the next two counties combined — Brevard (nine) and Volusia (10).

Ninety-three sea cow boat kills have been recorded statewide by FWC this year, and the state is on pace to break last year's record of 122 boat kills.

"We've seen increasing trends in both boaters and manatees in the area, and that unfortunately may lead to an increase in these types of water interactions," said FWC biologist Denise Boyd. "We've seen an increase in Lee County for the number of water craft-related manatee mortalities. It's the highest it's been for a six-month period and the most recent January to June is a record high."

Boyd said manatees spooked from shallow areas during summer months may end up in deeper boat channels, where boats travel much faster.

More boats traveling faster with more manatees is a deadly formula.

"Sound propagation through the water is a very difficult and challenging to understand," Boyd said. "They may hear one boat and not another and come up to take a breath. So there's a lot of factors that lead to them getting struck by boats."

Boyd said researchers don't know if the number of boat kills impacts the overall population, which is well over 5,000 animals in Florida waters.

"Because this is a recent increase (in boat kills), there will have to be lots of population modeling and other factors to determine if that's the case," she said.

The heart of the manatee population in Florida is from the Crystal River area south to the Florida Keys.

Norris said FWC hopes the increased patrol in Lee and other problematic counties will lead to fewer boat kills.

"We're focusing our efforts on manatee zones where we know there are a high number of manatees," Norris said. "They're designated manatee zones for a reason, and that's because a higher number of manatees like to congregate in that area. Maybe it's a food source, or maybe it's a travel corridor."

Norris said manatees are spread throughout coastal areas during the warmer summer months.

"This time of year there are a lot of boats on the water, and the manatees are dispersed and not really focused on one area," he said.

Norris said FWC wants to know about any manatee accidents, whether or not the driver of the boat was being careless.

"If they do strike one accidentally or if they were in a slow zone and knew they were in the wrong, we still want them to call us because we need to get out there to the manatee," Norris said.

Report dead or injured manatees at 888-404-3922.

*Connect with this reporter: @ChadGillisNP on Twitter.*



**LEGAL NOTICE**

**If You Received Cancer Treatment from Florida Cancer Specialists & Research Institute, LLC, or 21st Century Oncology LLC in Southwest Florida between January 1, 2010 and June 5, 2019, You Could Receive Money from a Settlement Totaling up to $7.1875 Million**

A settlement of up to $7,187,500 has been reached in a lawsuit claiming that Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS") entered into agreements with 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") that unlawfully raised the prices for cancer diagnosis and treatment. FCS denies that it engaged in any wrongdoing, but has agreed to settle.

**Who Is Included?** The Settlement Class includes persons or entities who, at any time between January 1, 2010 and June 5, 2019, paid directly for any part of the cost of Oncology Services (*i.e.*, diagnosis or treatment for cancer using either medicine or radiation) provided by FCS or 21st Century in Southwest Florida (i.e., Charlotte, Collier, Lee, Manatee, or Sarasota Counties). It does not include, however, federal or state governmental entities or agencies, including Medicare and Medicaid.

**What Are the Settlement Terms?** FCS has agreed to establish a Settlement Fund of up to $7,187,500. After deduction of attorneys' fees and litigation expenses, notice and settlement administration costs, and an incentive award to the class representative (the County of Monmouth, New Jersey), as approved by the Court, the Net Settlement Funds will be available for distribution to members of the Settlement Class. The distribution will be *pro rata*; that is, each Class member's share in the Settlement Fund will be proportional to the amount he, she, or it paid to FCS or 21st Century for Oncology Services during the class period. Because some individual Class members' claims may be for very small amounts, a minimum of $5 will be paid to each Class member.

**How Do I Get a Payment?** Once the Court approves the Settlement and authorizes distribution of payments to the Settlement Class, each Class member will *automatically* receive a payment by check for his, her, or its *pro rata* portion of the Settlement Fund.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement Class by **September 20, 2019**. If you do not timely exclude yourself, you will release any claims you may have against FCS and will not be able to sue FCS for any claim relating to the lawsuit. Note that if you exclude yourself, you no longer would receive a payment under the Settlement because you no longer would be a Class member. If you stay in the Settlement Class, you may object to it by **September 30, 2019**. The detailed notice available at the website below explains how to exclude yourself from or object to the Settlement. The Court will hold a hearing on October 29, 2019 to consider whether to approve the Settlement and requests for attorneys' fees and litigation expenses, notice and settlement administration costs, and incentive award to the class representative. When Settlement Class Counsel's motion for fees, costs, an incentive award, and expenses is filed, it will be available at the website below at least 30 days before the hearing. You may appear at the hearing, but you are not required to attend. To speak at the hearing, you must first object to the Settlement in writing pursuant to instructions available at the website below. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing.

**www.FCSClassAction.com** | **1-888-509-2623**

# Immigration

Continued from Page 3A

law, which went into effect on July 1, is being challenged in federal court.

The governor's office did not respond when asked if DeSantis would support any of the immigration proposals next session. And Gruters said it is "too early" for the governor to be involved in his bills.

With the passage of the sanctuary city ban, Gruters already allowed the governor to deliver on one of his campaign promises. And the Sarasota Republican may help DeSantis make good on another immigration pledge with the E-Verify proposal, which has faced fierce opposition from Florida agricultural and business interests in the past.

Gruters, meanwhile, said he is still open to considering other immigration-related bills. The senator is preparing to embark on a statewide immigration "listening tour." Dates and locations of the stops will be announced this week, Gruters said.

While the Republicans' crackdown on illegal immigration may help court conservative voters in advance of next year's elections, Democrats have lambasted the policies.

"These pieces of legislation are nothing more than a reflection of the President's xenophobic strategy of demonizing our immigrant communities and firing up the Republican base ahead of the 2020 election," Sen. Janet Cruz, D-Tampa, told the News Service.

Cruz is more aligned to what Simmons is proposing.

"Florida's economic future is dependent on continuing to build our reputation as a welcoming state that values diversity and inclusion," Cruz said. "Instead of driving undocumented immigrants further into the shadows, we should be doing all we can to ensure they have the ability to work legally, pay taxes, and live without fear of being separated from their families."

Simmons' softer approach to immigration policy may be a hard sell for his fellow Republicans, especially in an election year. Similar efforts previously have failed to gain traction in the Republican-controlled Legislature.

But undocumented immigrants to work and drive legally in Florida could resonate among Hispanic voters – a key constituency in the Sunshine State – at a time when immigrant communities are fearful of the new sanctuary city law.

The new statute requires local law enforcement agencies to fully cooperate with federal immigration authorities when undocumented immigrants are detained or in the custody of law enforcement. That can include detention over a driving offense.

Simmons said he still supports the sanctuary city law and does not believe exemptions should be carved out for undocumented immigrants who commit minor driving offenses.

Instead, he says undocumented immigrants should follow state driving laws and be given the ability to have insurance. Simmons said his proposal would put together an "immigration policy that works," until the federal government acts.

Senate President Bill Galvano's office said none of the immigration proposals were sought at his direction. While Galvano has spoken with Gruters, the Senate president has not talked with Simmons about his bill yet, according to Senate spokeswoman Katie Betta.

"Oftentimes senators from both parties will mention ideas to the president or let him know what they are working on, but he doesn't green-light or red-light every proposal from the onset," Betta said in an email. "To the contrary, the president makes every effort to refrain from weighing in, so that senators have the opportunity to vet their ideas with their colleagues and constituents."

Though the Senate's top Republican says he has refrained from chiming in on the immigration policies, the business lobby is already gearing up for a fight – at least when it comes to E-Verify.

"It will certainly be a priority of ours," said Towson Fraser, a spokesman for the American Business Immigration Coalition.

Fraser said the group – and a "majority of businesses" – oppose E-Verify and will likely have discussions in the near future to determine what resources will be devoted to the fight against the policy.

LEGAL NOTICE

**If You Received Cancer Treatment from Florida Cancer Specialists & Research Institute, LLC, or 21st Century Oncology LLC in Southwest Florida between January 1, 2010 and June 5, 2019, You Could Receive Money from a Settlement Totaling up to $7.1875 Million**

A settlement of up to $7,187,500 has been reached in a lawsuit claiming that Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS") entered into agreements with 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") that unlawfully raised the prices for cancer diagnosis and treatment. FCS denies that it engaged in any wrongdoing, but has agreed to settle.

**Who Is Included?** The Settlement Class includes persons or entities who, at any time between January 1, 2010 and June 5, 2019, paid directly for any part of the cost of Oncology Services (*i.e.*, diagnosis or treatment for cancer using either medicine or radiation) provided by FCS or 21st Century in Southwest Florida (i.e., Charlotte, Collier, Lee, Manatee, or Sarasota Counties). It does not include, however, federal or state governmental entities or agencies, including Medicare and Medicaid.

**What Are the Settlement Terms?** FCS has agreed to establish a Settlement Fund of up to $7,187,500. After deduction of attorneys' fees and litigation expenses, notice and settlement administration costs, and an incentive award to the class representative (the County of Monmouth, New Jersey), as approved by the Court, the Net Settlement Funds will be available for distribution to members of the Settlement Class. The distribution will be *pro rata*; that is, each Class member's share in the Settlement Fund will be proportional to the amount he, she, or it paid to FCS or 21st Century for Oncology Services during the class period. Because some individual Class members' claims may be for very small amounts, a minimum of $5 will be paid to each Class member.

**How Do I Get a Payment?** Once the Court approves the Settlement and authorizes distribution of payments to the Settlement Class, each Class member will *automatically* receive a payment by check for his, her, or its *pro rata* portion of the Settlement Fund.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement Class by **September 20, 2019**. If you do not timely exclude yourself, you will release any claims you may have against FCS and will not be able to sue FCS for any claim relating to the lawsuit. Note that if you exclude yourself, you no longer would receive a payment under the Settlement because you no longer would be a Class member. If you stay in the Settlement Class, you may object to it by **September 30, 2019**. The detailed notice available at the website below explains how to exclude yourself from or object to the Settlement. The Court will hold a hearing on October 29, 2019 to consider whether to approve the Settlement and requests for attorneys' fees and litigation expenses, notice and settlement administration costs, and incentive award to the class representative. When Settlement Class Counsel's motion for fees, costs, an incentive award, and expenses is filed, it will be available at the website below at least 30 days before the hearing. You may appear at the hearing, but you are not required to attend. To speak at the hearing, you must first object to the Settlement in writing pursuant to instructions available at the website below. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing.

www.FCSClassAction.com          1-888-509-2623



**Foot Problem? No Problem!**

- Plantar Fasciitis, Bunions, Neuropathy
- Reconstructive Ankle and Foot Surgery
- Accept Most Major Insurance Carriers
- Diabetic Care and Management
- Onsite Diagnostic Imaging
- Woundcare / Limb Salvage

**Call Now (239) 895-9741**

John Mina, DPM ABPMS



**SOUTHWEST FLORIDA ANKLE & FOOT CARE SPECIALISTS**

Cape Coral - North Fort Myers - Fort Myers - Lehigh Acres
16 locations serving Collier, Lee, Charlotte, and Hendry Counties

John Mina, DPM - Joseph Pusateri, DPM - Ricardo Maribona, DPM - John Lawlor, DPM - Ralph Lerman, DPM - David Kanuck, DPM
Howard Imanuel, DPM - Duane Cumberbatch, DPM - Soorena Sadri, DPM - Gordon Kleinpell, DPM - Marc Nathanson, DPM

facebook          www.aimsfl.com          Google

# Homeowners with Tile Roofs must read this!

- Did you know there still is time to File an insurance claim from Hurricane Irma?
- Under Florida Law Statute, 627.70132 **Notice of Windstorm or Hurricane**, you have 3 years to file a claim within 3 years after the hurricane made landfall or the windstorm caused the covered damage. Do not wait to the last minute to file a claim, the longer the wait, the more difficult for approvals.
- Did You know if your hurricane claim was considered "closed" you can reopen the claim with one phone call to your insurance carrier?

**Do you know if you have damage to your tile roof?**

- Many homeowners associate a leaking roof with a damaged roof. In many homes the tiles can be cracked, broken or missing but will not cause a visible leak. Most tile damage cannot be seen from the ground.
- Many of the Tile roofs in Florida were constructed with tiles that are no longer manufactured or available for repairs.
- If you had a previous insurance claim did your adjuster inform you about the "Discontinued or Obsolete" roof tile?
- The Tile Roofing Institute governs the actual building code for tile roofing in Florida. The Tile Roofing Institute has published a list titled: "Obsolete Concrete Roof Tiles Formerly Produced in Florida": **https://tileroofing.org/wp-content/uploads/TRI-Obsolete-Concrete-Roof-Tile-rev10092017.pdf**

**Existing Roof Repairs & Roof Replacement**

- What if you already paid thousands of dollars for repairs after the hurricane and did not file a claim? Many homeowners have paid a Roofer or a Handyman to repair the roof after the Hurricane. We can assist homeowners to be reimbursement by the insurance company for the repair cost they have incurred. This reimbursement will get paid directly to the homeowner. The repairs incurred are considered "temporary repairs" to stop further damage to home.
- Did you receive a repair cost only by your insurance carrier and not a roof replacement cost? We can submit for an approval to the insurance carrier for a new roof even if you have already received payment for a repair. The claim is not closed!
- The acceptance of a repair check from an insurance company does not mean the claim is closed.
- What If the insurance company has offered a repair cost for your home? If the insurance company has offered a repair cost to your home, then they are also admitting the Hurricane caused damage to your home. The admittance of this damage opens the flood gates for getting your roof approved for replacement. It does not matter how many tiles were damaged, what matters is if the existing tiles on your roof are still produced today by the same manufacturer.
- Many insurance companies will expect you to repair your home with "used" tiles. Why should you accept used materials on your roof?
- Did you know that many insurance companies will give you a list of suppliers that sell "used" tile? There is no warranty and history of the used tiles sold to you. The tiles produced today are manufactured differently for strength/quality in comparison to the tiles produced 10 years ago.

**Color Matching Laws**

- If you have already repaired your roof but the color of the tiles does not match exactly as the original roof, it is possible you could be approved for a full roof replacement. There are laws in Florida that pertain to Color Matching. Florida Law Statute, 626.9744 describes the claims settlement practices that pertain to replacement of items that do not match in quality, color or size.
- Has your insurance company or insurance adjuster told you about this Statute?

**Massey Inspection Process**

- Wind uplift Test – Many roofs are damaged from Hurricane without broken or cracked tiles. The building codes has guidelines for how much lift a tile can have before it is considered "damaged". Hurricane Irma was strong enough to cause "uplift" damage to tile roofs even if the tiles were not cracked. Did your insurance adjuster test for uplift?
- Live Video Inspections in real time. We can inspect your roof while you are inside your home at time of scheduled inspection or if you are out of state. All you need is a phone or computer and you can see what we see at the same time. We only need access to the roof.
- We take on average 100 pictures for each inspection and count the number of broken tiles.
- Documentation of how the tiles are broken or cracked. The wind damage on tile has certain characteristics of how it is broken or cracked.
- Tile Verification – we document what type of tile you have to determine the origin of manufacturer.

**Insurance Estimates**

- Our cost estimates are "apples to apples" with the insurance company, we use the same estimating software and cost database as the insurance company. Using the same cost database as the insurance company helps streamline the process for approvals.
- Did you know you are not required to get three cost estimates as encouraged by your insurance company?
The insurance companies want you to present them the lowest cost estimate. Do you really want the cheapest labor and materials on your home?

**What if the claim is denied when contracted with Massey?**

- In the event your claim is denied when contracted with Massey, we provide a legal team at our expense to get your claim approved. Our Attorneys specialize in insurance claims.

**When Contracted with Massey**

- Let Massey do all the work. We have a staff that communicates with the Insurance Company during the entire process. We will include you on all communications to the insurance company during the approval process. Let us deal with the headaches.
- There is no cost obligation with Massey if the insurance claim is not approved by your Insurance Company. No upfront money or deposits are required to start the approval process. Our goal is to get a new roof approved for you.

**What can happen if you do not file a Hurricane Irma claim?**

- The insurance companies had a significant financial impact with regards to tile roofs in Florida due to the Hurricanes. After the 3-year time limit has elapsed to file an insurance claim, the insurance company has right to inspect your roof to determine if there is existing damage to your roof. If damage is found on roof, the insurance company has right to drop insurance coverage on your home. If coverage is dropped, you could be forced to find a new insurance company. The "new insurance company" will most likely not approve your coverage unless you provide a new roof at your own expense. Why take this risk? You pay your premiums to have coverage.

**WHY CHOOSE MASSEY CONSTRUCTION GROUP, INC.?**
Florida Licensed Contractor for 20 years - Locally owned/operated - A+ rated by the Better Business Bureau - Certified by the Tile Roofing Institute - Certified by Haag Engineering for High Wind on roofs - Insurance Construction Specialist - In house crews - Tile Roofs installation is our specialty - Our crews leave your house clean - Live video inspections – Free Roof Inspections 7 days a week – call anytime!!




CLASSIC WIND DAMAGE BREAK

TEMPORARY REPAIRED DISCOLORED TILES

BROKEN AND TEMPORARILY REPAIRED TILES

LIVE DRONE INSPECTION

**To Schedule An Appointment Call 239-234-1790**
Or visit: www.masseyroofingservices.com | State Licensed and Insured | CCC1328914 | CGC060399

# Gymgoers lament losing camaraderie, convenience

**By Carlos R. Munoz and Jonah Hinebaugh**
Staff Writers

SARASOTA — Deanna Mauch has been going to the Evalyn Sadlier Jones YMCA branch for more than 12 years.

During Mauch's time at the YMCA, she has made dozens of friends through the classes offered.

"People love to just come and interact with others whether it's getting coffee or taking classes," Mauch said Wednesday, a day after word came that the Sadlier Jones branch at Potter Park Drive — and the Frank G. Berlin Sr. Branch on South Euclid Avenue — would close permanently on Sept. 13. "No one had a clue, it gives instructors and employees such short notice to line something else up."

"I was in shock when I overheard employees talking about it closing," Mauch said.

"I've aimed to go every morning Monday through Friday. Everything else is so far I'm not sure what alternatives there are that are close to me."

The closing of the branches poses a problem for new residents to the area as well.

Dan Webb splits his time between Florida and California. Here he struggled to find a nearby gym and decided to join the YMCA.

Webb is a member of LA Fitness — a commercial gym that the YMCA's interim CEO cited as a contributor to the branches closing — but with the closest one being more than 20 minutes away, he's worried about the drawbacks and about the displacement of YMCA members.

"I think it's a lifesaver for older residents in the area," Webb said.

"There aren't many nearby places where they can receive the same type of encouragement from other members that pushes them to keep an active lifestyle."



Deanna Mauch has lived in Sarasota for 21 years and has been a member of the YMCA for more than half that time. She says she has made many friends in the classes she attends at the Evalyn Sadlier Jones branch.
[HERALD-TRIBUNE STAFF PHOTO / JONAH HINEBAUGH]



Dan Webb recently got a membership to the YMCA and is worried about the drawbacks of the Sarasota fitness branches closing in September. Many alternative options aren't close to many residents that frequent the Evalyn Sadlier Jones branch.
[HERALD-TRIBUNE STAFF PHOTO / JONAH HINEBAUGH]

## FERNANDES
*From Page A1*

go out of business.

But, meanwhile, those gyms still in business around the area see an opening.

As well they should. Scores of folks, male and female, old and young, won't simply sacrifice that rush of endorphins a workout provides just because their place to experience it soon will wear a toe tag.

There are other gyms, other places to sweat to your heart's content. Many of them. Google "gyms in Sarasota" and get your scrolling finger ready.

Who's not trying to woo the soon-to-be-displaced Sarasota YMCAers? The question should be, why in the heck wouldn't they try?

Both the Manatee Family YMCA and the SKY Family YMCA in Venice will waive the joiner fee for Sarasota Y members and offer their first month free.

"We feel for them," Erin Chokr, the director of marketing and communication for the Venice Y, said. "We are very saddened with what happened in Sarasota."

We're sad up here too.

According to Sean Allison, the CEO of the Manatee County YMCA, the Y's in Parrish, Lakewood Ranch and Bradenton are offering the first month free, too.

"There are a number of Manatee County residents who are members of the Sarasota Y," he said. "First and foremost it's to remind people who live in Manatee County who are members that Manatee County has a Y."

Allison was asked a question he clearly didn't expect. Might folks jettisoned by the Sarasota Y have a residual bad taste that would preclude them from joining Y's in Manatee or Venice?

"I hope not," he said. "We're all managed independently, so we're all managed differently. Some people are bound to be upset by this."

The Manatee Y issued a press release Wednesday announcing the free month. Was a corporate decision made that quickly, without hesitation?

Nope. Y employees elsewhere knew for some time the Sarasota branches were on life support.

"This decision was made before their announcement was made," Chokr said. "We knew they were struggling."

To be fair, don't believe the Y's in Bradenton and Venice solely see dollar signs in this. If they are true to their ideals, this is more about helping people thrown an unexpected curve ball through no fault of their own.

But as for Crunch Fitness …

Its four area locations are running a "Make the Switch" promotion. The enrollment fee, between $30 and $70, will be waived for any current Sarasota Y member who brings in their tag.

Would prefer not to get your fitness from Crunch? More of a west coast sort of gym rat? The LA Fitness at the Southgate Mall is offering a two-week introductory pass.

Everyone, it seems, is extending an olive branch to Sarasota Y members. The Senior Friendship Centers want the Y's senior members to give them a look. It has fitness equipment, but also programs and discussion groups tailored specifically for seniors.

Want a little more rough-hewn environment? Jaco's Boxing + Fitness Gym is offering Sarasota Y members who show their tag one week free. Its personal trainers will discount their first session as well.

Even the Burn Boot Camp on Fruitville Road sees the chance to capitalize. It stresses "personal training in a group setting" and is offering a free August to Y members, or they can pay $99 for six weeks starting the end of September.

Owner Lindsay Scheuer said complimentary child care is available. Any workout can be tailored to a person's age and level of movement.

Sure, it's nice and all so many seem ready to step forward and fill the workout void. But any club is more than simply the mats and machines.

People paid to attend the Y … because it was the Y.

And no matter how hard these other places try, that experience can't be recreated.



Aaron Jaco, left, is shown training at his brother Adam's gym in Sarasota before a fight against Kelly Pavlik in 2012.
[HERALD-TRIBUNE STAFF FILE PHOTO / THOMAS BENDER]





**Peltz Shoes** — a perfect fit

**BRAND SPOTLIGHT**

Men's Adrenaline **$130** Wide Width

BROOKS

Women's Adrenaline **$130** Wide Width

**peltzshoes.com**

SARASOTA 1920 Stickney Point Rd  Mon-Sat 10am-9pm | Sun 11am-6pm
BRADENTON 5275 University Pkwy  Mon-Sat 10am-9pm | Sun 11am-6pm

### LEGAL NOTICE
**If You Received Cancer Treatment from Florida Cancer Specialists & Research Institute, LLC, or 21st Century Oncology LLC in Southwest Florida between January 1, 2010 and June 5, 2019, You Could Receive Money from a Settlement Totaling up to $7.1875 Million**

A settlement of up to $7,187,500 has been reached in a lawsuit claiming that Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS") entered into agreements with 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") that unlawfully raised the prices for cancer diagnosis and treatment. FCS denies that it engaged in any wrongdoing, but has agreed to settle.

**Who Is Included?** The Settlement Class includes persons or entities who, at any time between January 1, 2010 and June 5, 2019, paid directly for any part of the cost of Oncology Services (*i.e.*, diagnosis or treatment for cancer using either medicine or radiation) provided by FCS or 21st Century in Southwest Florida (i.e., Charlotte, Collier, Lee, Manatee, or Sarasota Counties). It does not include, however, federal or state governmental entities or agencies, including Medicare and Medicaid.

**What Are the Settlement Terms?** FCS has agreed to establish a Settlement Fund of up to $7,187,500. After deduction of attorneys' fees and litigation expenses, notice and settlement administration costs, and an incentive award to the class representative (the County of Monmouth, New Jersey), as approved by the Court, the Net Settlement Funds will be available for distribution to members of the Settlement Class. The distribution will be *pro rata*; that is, each Class member's share in the Settlement Fund will be proportional to the amount he, she, or it paid to FCS or 21st Century for Oncology Services during the class period. Because some individual Class members' claims may be for very small amounts, a minimum of $5 will be paid to each Class member.

**How Do I Get a Payment?** Once the Court approves the Settlement and authorizes distribution of payments to the Settlement Class, each Class member will *automatically* receive a payment by check for his, her, or its *pro rata* portion of the Settlement Fund.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement Class by **September 20, 2019**. If you do not timely exclude yourself, you will release any claims you may have against FCS and will not be able to sue FCS for any claim relating to the lawsuit. Note that if you exclude yourself, you no longer would receive a payment under the Settlement because you no longer would be a Class member. If you stay in the Settlement Class, you may object to it by **September 30, 2019**. The detailed notice available at the website below explains how to exclude yourself from or object to the Settlement. The Court will hold a hearing on October 29, 2019 to consider whether to approve the Settlement and requests for attorneys' fees and litigation expenses, notice and settlement administration costs, and incentive award to the class representative. When Settlement Class Counsel's motion for fees, costs, an incentive award, and expenses is filed, it will be available at the website below at least 30 days before the hearing. You may appear at the hearing, but you are not required to attend. To speak at the hearing, you must first object to the Settlement in writing pursuant to instructions available at the website below. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing.

www.FCSClassAction.com        1-888-509-2623



**MACULAR DEGENERATION ASSOCIATION**

Macular degeneration is reaching epidemic proportions.

**LEARN HOW TO FIGHT BACK!**

**SATURDAY AUGUST 3, 2019**
Joshua Mali, M.D.

**Location:** Parkinson Place
5969 Cattleridge Blvd.,
Suite 100 Sarasota, FL 34232.

**FREE 2019 Awareness Program**

**EYES ON SIGHT**
**New treatments & Innovations.**

Seating is Limited • Reservations Required
8:30 a.m. to 12:00 p.m • Buffet Breakfast Included

**To Register, Please call 1-855-962-2852**

SF-1858835

Case 2:18-cv-00201-SDM-MRM   Document 92-2   Filed 09/09/19   Page 20 of 20 PageID 671

# Issues strain Catholic charities

**By David Crary**
The Associated Press

NEW YORK — For U.S. charities affiliated with the Roman Catholic Church, the past year has tested the resilience of their fundraisers and the loyalty of their donors in unprecedented fashion. Even as many donors reacted in dismay to the church's extensive sex-abuse scandals, the charities faced new challenges trying to address the immigration crisis at the U.S.-Mexico border.

For the agencies with the most donors, Catholic Charities and Catholic Relief Services, it's too early to gauge the overall financial impact of sex-abuse developments last year. Those included abuse allegations that led to former Cardinal Theodore McCarrick's ouster from the priesthood and a Pennsylvania grand jury report asserting that about 300 Roman Catholic priests had abused children at six of the state's dioceses over seven decades.

However, several local Catholic Charities affiliates report a drop in donations linked at least in part to the scandals.

In Pittsburgh, the largest diocese targeted by the Pennsylvania grand jury, local Catholic Charities executive director Susan Rauscher said donations were down this year, though she had no figures yet. The Rev. Nicholas Vaskov, a spokesman for the diocese, estimated that giving directly to the diocese had declined about 10% — due to churchgoers' unhappiness with a reorganization of parishes as well as dismay over sex abuse. Staff cuts have resulted.

Pittsburgh Bishop David Zubik, like some bishops elsewhere, has told donors that none of their gifts would be diverted to a new compensation fund for abuse victims; he said the fund would be financed largely through sale of properties.

In western New York's diocese of Buffalo, many angry parishioners have withheld donations as Bishop Richard J. Malone faced criticism for allowing priests accused of inappropriate conduct to remain in ministry.

Leaders of Buffalo's Catholic Charities affiliate worried about impact on their programs serving more than 150,000 people. So they offered a deal: Unlike past years, when gifts to its annual appeal were split between the charity and the diocese, donors this year could choose to direct their entire donation to the charity. More than 50% of donors picked that option.

"People are confused. ... They're upset with the Catholic church," said Dennis Walczyk, president of Catholic Charities of Buffalo. "But don't take it out on the people that really need help."

Despite the new approach, the annual appeal, which ended June 30, came up about $1.7 million short of its $11 million goal. Walczyk said the charities' programs would persevere, but the diocese warned it might have less money for schools, youth ministries and hospital chaplains.

Next door to the Buffalo diocese, the Catholic Charities affiliate in Rochester managed to boost contributions about 80% from 2016 to 2018 thanks to new fundraising initiatives. Yet the abuse crisis has cast a shadow there as well — Catholic Charities is among the defendants in a lawsuit alleging that a now-deceased priest sexually abused a child at a Catholic Charities facility in Rochester 50 years ago.

Catholic Charities USA, which oversees operations of its affiliates in dioceses nationwide, has recently issued urgent appeals for more donations to help address the needs of immigrants and refugees, notably along the U.S.-Mexico border.

"100% of your donation will help our agencies along the border ... and ensure that children are being treated with care and kindness," said an appeal last month. "Without additional funding, Catholic Charities agencies struggle to meet the growing needs of the migrant crisis."

Catholic Charities has not publicly provided any recent update on its overall donor support, although its CEO, Dominican Sister Donna Markham, sounded words of warning last year.

"Anybody who is working in Catholic organizations right now is being hit by the fallout from the abuse crisis," she told Catholic News Service. "We have been faced with some of our significant donors saying, 'No more money to Catholic Charities until the bishops straighten out this mess.'"

A national survey released in June by the Pew Research Center reinforced Markham's concerns; it reported that one-fourth of Catholics said they had reduced donations and scaled back Mass attendance because of the abuse crisis.



In this July 17 photo, Chris Williams, left, of Catholic Charities shakes hands with a father from Nigeria during a visit at Catholic Charities in San Diego. As charities face new challenges due to the immigration crisis at the U.S.-Mexico border, some local Catholic Charities affiliates report a drop in donations.
[GREGORY BULL/THE ASSOCIATED PRESS]

---

# ZONING

*From Page A1*

the Sarasota County School Board to voluntarily desegregate in 1957, but the board persistently refused until the NAACP filed a desegregation lawsuit in federal court in 1961.

In 1962, the first black students were enrolled in previously all-white Sarasota County schools. The court-ordered desegregation divided Newtown into small insets, which resulted in busing black kids to previously all-white schools that were farther away, and the neighborhood schools were closed.

School busing returned to the national spotlight a few weeks ago during a Democratic presidential candidate debate. U.S. Sen. Kamala D. Harris, D-Calif., challenged former Vice President Joe Biden for opposing court-ordered busing in the 1970s, saying that busing decisions should be local decisions — not federal mandates. Last week, Harris softened her stance, saying that federally mandated busing is a tool to be "considered" but implemented only if local governments are "actively opposing integration."

### Differing views

Sarasota School Board member Shirley Brown has been raising the issue of school zoning for the past few years, ultimately to no avail, but said it was still on Bowden's list of issues to address.

Brown pointed out children in the insets are bused past neighborhood schools that actually have more resources for children from lower-income areas because of federal Title I funding.

"At our Title I schools, we have the reading coaches, we have the the homeschool liaison, now we have the Summer Learning Academies," Brown said. "Supposedly those little insets were set up before to help these kids, you know, get a leg up, but they, in fact, are getting less services than if they were going to their district."

School Board member Caroline Zucker, on the other hand, said she is in "full support" of the insets.

"It lets children see other people and other career options than they would get to see in their own community," Zucker said.

Bowden said that every student deserves an opportunity to excel both academically and personally, and he wants to develop a plan to ensure all students have equal opportunities.

"For students who are transported from one section of town to another, they may be at a disadvantage from others who are able to attend school with their friends in their own community," Bowden said.

### Family challenges

Sabrina Freeman says that the school zoning creates more problems than solutions for her family. She, her two daughters, and six grandchildren all live in Newtown, a few blocks apart. They're within walking distance of Emma E. Booker Elementary, but the kids are zoned for two different elementary schools.

Two of her grandchildren attend Brookside Middle school, which is about 30 minutes from their home.

"The challenges are if something happens. They're kids. They fall, they break arms," Freeman said. "It weighs on your mind. I'm at home, and it worries me thinking about how they're doing in school and hoping that nothing happens. I'm here with no transportation trying to scramble to get them because their mother can't leave work."

One of her grandsons, Silas Love III, had an asthma attack at Phillippi Shores Elementary, about 6 miles away from home, and nobody was able to pick him up in time. The school called an ambulance, and later called child protective services because the family wasn't able to pick him up, his great-grandmother, Phyllis Allen, 77, said. While the family ultimately did not face any repercussions, the authorities' involvement added stress to an already difficult situation.

"It's an unnecessary hardship on the family," Allen said. "It's important that our children's caretakers can get to schools to take care of the children."

Silas died from a subsequent asthma attack about a year later, at 9 years old. He would have been 15 this year.

Phyllis Allen said that the Newtown community comes together to take care of each other's children when the parents or grandparents are unable. She and her husband, Tommie Allen Sr., 74, have 14 great-grandchildren, and two on the way. They've all lived in their great-grandparents' house at some point.

The couple met when they both attended Booker High School, before court-ordered desegregation and zoning insets.

Parents do have the option to choose what school their child goes to, but if they choose a school outside of their zone, their child will not be able to ride the bus. Their parents would have to drive them, which many are unable to do because of their jobs or a lack of resources.

"I don't think enough of the parents even know about how to pick a school outside of their district, because that's not on their radar, something that they're thinking about planning years in the future," Brown said. "It's not just about the summer learning academies. It's about when there's muffins or doughnuts with Dad, or when it's extra help that they provide after school, or when the children have a recognition day and the parents can't come in for those things. That's difficult."

One of Freeman's granddaughters attends Emma E. Booker, a school in the neighborhood, because her mother filled out paperwork to choose a school outside of the zone.

"She's less than two blocks from home and her grades are phenomenal now that she's close to home," Freeman said.

But the process to pick what school your children attend is difficult, Freeman said, which is why all of the grandchildren don't attend schools close to home.

### Schools' perspective

Tenille Johnson's daughter is bused to Phillippi Shores, about 6 miles from the family home, or a 20-minute drive. The school doesn't offer a Summer Learning Academy.

"I've been trying to get her in summer school since kindergarten, and she's in third grade now," Johnson said. "They try to kick her back every year, and if she had summer school, she wouldn't be getting left behind."

Guilda Langston is the clinic attendant/health aide at Phillippi Shores and has worked there for 33 years. She said she sees what the zoning in Newtown does to students and families, and it's "just not fair."

"Parents don't have transportation to get out. Schools should be closer to their homes and they would have the parent involvement," Langston said.

Dusty French, principal of Fruitville Elementary, said it's hard for some parents to get to school and be involved.

"I can only speak for my school; we will do whatever we need to, to get them here," French said. "We go out to them. I have provided Ubers, taxis and whatever else, or bus passes. The lack of involvement is not usually on the willingness of families."

Bowden said he wants to work with the School Board and local and state governments to review and assess data and develop the right plan that places all students on an "equal playing field." One possibility is allowing families to choose whether they want to attend their zoned school or their neighborhood school, and provide transportation for both options.

If the zoning was changed, it would have to be decided by the end of the 2019-20 school year to be effective for the 2020-21 school year.

"This is a conversation best led by the community — what do they want?" Bowden said.

*This story comes from Aspirations Journalism, an initiative of The Patterson Foundation and Sarasota Herald-Tribune to inform, inspire and engage the community to take action on issues related to Age-Friendly Sarasota, Suncoast Campaign for Grade-Level Reading, National Council on Aging's 100 Million Healthier Lives and the Suncoast Nursing Action Coalition.*

---



**The Handyman Company**

*A Trusted Company Since 1999*

☑ One Year Warranty     ☑ Guaranteed Price

• Handyman Jobs          • Soffit, Fascia, Decks
• Doors & Windows        • Drywall & Painting
• Carpentry & Fencing    • Flooring
• Bath Remodels          • Much More...

100% SATISFACTION GUARANTEED

**CALL TODAY!**
**941-548-1888**

The-Handyman-Company.com

Lic. #CBC1258366

---



**LEGAL NOTICE**

**If You Received Cancer Treatment from Florida Cancer Specialists & Research Institute, LLC, or 21st Century Oncology LLC in Southwest Florida between January 1, 2010 and June 5, 2019, You Could Receive Money from a Settlement Totaling up to $7.1875 Million**

A settlement of up to $7,187,500 has been reached in a lawsuit claiming that Florida Cancer Specialists & Research Institute, LLC, formerly known as Florida Cancer Specialists, P.L., and Dr. William N. Harwin (collectively, "FCS") entered into agreements with 21st Century Oncology LLC and Dr. Daniel Dosoretz (collectively, "21st Century") that unlawfully raised the prices for cancer diagnosis and treatment. FCS denies that it engaged in any wrongdoing, but has agreed to settle.

**Who Is Included?** The Settlement Class includes persons or entities who, at any time between January 1, 2010 and June 5, 2019, paid directly for any part of the cost of Oncology Services (*i.e.*, diagnosis or treatment for cancer using either medicine or radiation) provided by FCS or 21st Century in Southwest Florida (i.e., Charlotte, Collier, Lee, Manatee, or Sarasota Counties). It does not include, however, federal or state governmental entities or agencies, including Medicare and Medicaid.

**What Are the Settlement Terms?** FCS has agreed to establish a Settlement Fund of up to $7,187,500. After deduction of attorneys' fees and litigation expenses, notice and settlement administration costs, and an incentive award to the class representative (the County of Monmouth, New Jersey), as approved by the Court, the Net Settlement Funds will be available for distribution to members of the Settlement Class. The distribution will be *pro rata*; that is, each Class member's share in the Settlement Fund will be proportional to the amount he, she, or it paid to FCS or 21st Century for Oncology Services during the class period. Because some individual Class members' claims may be for very small amounts, a minimum of $5 will be paid to each Class member.

**How Do I Get a Payment?** Once the Court approves the Settlement and authorizes distribution of payments to the Settlement Class, each Class member will *automatically* receive a payment by check for his, her, or its *pro rata* portion of the Settlement Fund.

**Your Rights May Be Affected.** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement Class by **September 20, 2019**. If you do not timely exclude yourself, you will release any claims you may have against FCS and will not be able to sue FCS for any claim relating to the lawsuit. Note that if you exclude yourself, you no longer would receive a payment under the Settlement because you no longer would be a Class member. If you stay in the Settlement Class, you may object to it by **September 30, 2019**. The detailed notice available at the website below explains how to exclude yourself from or object to the Settlement. The Court will hold a hearing on October 29, 2019 to consider whether to approve the Settlement and requests for attorneys' fees and litigation expenses, notice and settlement administration costs, and incentive award to the class representative. When Settlement Class Counsel's motion for fees, costs, an incentive award, and expenses is filed, it will be available at the website below at least 30 days before the hearing. You may appear at the hearing, but you are not required to attend. To speak at the hearing, you must first object to the Settlement in writing pursuant to instructions available at the website below. You may also hire your own attorney, at your own expense, to appear or speak for you at the hearing.

www.FCSClassAction.com     1-888-509-2623