COUNTY OF MONMOUTH,
NEW JERSEY,

     Plaintiff,

v.                               Case No:  2:18-cv-201-FtM-23MRM

FLORIDA CANCER SPECIALISTS,
P.L., et al.,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

This cause is before this Court on the plaintiff's unopposed motion for final approval of class settlement and plan of allocation, and incorporated memorandum of law filed on September 9, 2019 (Doc. 92) and plaintiff's counsel's separately filed application for (1) an award of attorney's fees, (2) reimbursement of expenses, and (3) class representative's incentive award filed on the same day (Doc. 93). In short, the Undersigned finds the class settlement overall fair and reasonable. (*See* Doc. 92; Doc. 80-1). For the reasons explained below, the Undersigned recommends that the plaintiff's unopposed motion for final approval of class settlement and plan of allocation be granted subject to further modification to the allocation plan. (Doc. 92; Doc. 92-1). The Undersigned also recommends that plaintiff's counsel's application for (1) an award of attorney's fees, (2) reimbursement of expenses, and (3) class representative's incentive award (Doc. 93) be granted.

## RELEVANT PROCEDURAL HISTORY

A review of the relevant procedural history of this litigation is instructive. The County of Monmouth, New Jersey, on behalf of a proposed class, sues Florida Cancer Specialists and

president or "managing physician," Dr. William N. Harwin, (collectively FCS) under Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1-2. (Doc. 27 at 4).[1] The County alleges that Dr. Harwin and Dr. Daniel Dosoretz, former Chief Executive Officer of 21st Century, (collectively 21st Century), agreed not to compete in the market for oncology services in Southwest Florida and to refer patients to each other exclusively. (Doc. 27 at 5). Allegedly, FCS agreed to offer in Southwest Florida only "medical oncology services" and to refer Southwest Florida patients to 21st Century for "radiation oncology." (Doc. 27 at 14). Likewise, 21st Century agreed to offer in Southwest Florida only "radiation oncology services" and to refer Southwest Florida patients to FCS for "medical oncology." (Doc. 27 at 14). On February 22, 2019, plaintiff and proposed class counsel Robins Kaplan LLP filed an unopposed motion for preliminary approval of their proposed class settlement agreement, which if approved would resolve all claims against FCS. (Doc. 80 at 8).[2]

On April 4, 2019, Chief Judge Merryday entered an order deferring ruling on the unopposed proposed settlement agreement (Doc. 80) because he identified several issues in the plaintiff's motion and the parties' proposed settlement agreement. (*See* Doc. 82 at 13). The parties' unopposed motion for settlement asked the Court "(1) for preliminary approval of the settlement, (2) for certification of the class for the purpose of settlement, (3) for appointment as class representative, (4) for appointment of Eamon O'Kelly of Robins Kaplan LLP as class counsel, and (5) for approval of a notice to the settlement class members." (Doc. 80 at 8; Doc. 82 at 1).

---

[1] Page citations to the record refer to the CM/ECF pagination unless otherwise noted.

[2] 21st Century Oncology and Dr. Daniel Dosoretz are not named defendants in this lawsuit.

The order directed the parties to show cause as to why the motion should not be denied or to withdraw the motion and submit a revised settlement agreement and preliminary approval motion. (Doc. 82 at 13). Chief Judge Merryday emphasized the complexity of the case and, while he noted the settlement agreement and motion for preliminary approval appeared reasonable and tailored to Rule 23, he pointed out obvious deficiencies in the settlement agreement itself and the notice plan, cautioning against granting preliminary approval. (Doc. 82 at 5-6). The issues Chief Judge Merryday identified in the unopposed proposed settlement agreement are summarized below.

First, Chief Judge Merryday was concerned that the settlement agreement's expansive release might render the settlement unfair and unreasonable. (Doc. 82 at 7). Chief Judge Merryday also stressed that the parties' settlement agreement and notice provided insufficient information about the claiming process. (Doc. 82 at 7-8). The parties had failed to submit a draft claim form of their notice directing class members to file a claim in order to obtain recovery. (Doc. 82 at 7-11). Further, the claiming requirement created an "opt-in" type settlement that would exclude class members who failed to act and bind that class member to any judgment. (Doc. 82 at 8). Chief Judge Merryday explained that a claiming requirement is unnecessary because FCS possesses the records necessary to provide a satisfactory, inexpensive, and accurate distribution of the settlement fund. (Doc. 82 at 8). Because, class members submit claims at notoriously low rates, Chief Judge Merryday explained that a burdensome claiming process can result in a denial of preliminary approval. (Doc. 82 at 9). The Court noted that the parties also failed to explain the need for claim filing or to provide assurances the claiming process will not unduly burden class members. (Doc. 82 at 9).

Second, Chief Judge Merryday found the explanation of the administrative process of the settlement to be insufficient. (Doc. 82 at 9). Specifically, the settlement agreement stated, "[t]he Settlement Fund shall be . . . distribute[d] to authorized claimants" but failed to explain the process of identifying those authorized claims nor did the notice state a deadline to file a claim. (Doc. 82 at 9; Doc. 80-3 at ¶ 35(e)). Chief Judge Merryday noted that a settlement administrator is usually hired to oversee the claiming process, and noted while the parties seemed to contemplate a settlement administrator, they failed to name an administrator, state the administrator's duties, or explain how the parties will pay an administrator. (Doc. 82 at 10).

Third, Chief Judge Merryday found that the settlement agreement did not include enough information to allow a class member to estimate any recovery. (Doc. 82 at 10-11). The agreement stated only that "[t]the distribution of the Settlement Fund shall be administered pursuant to a plan of allocation prepared by Plaintiffs'[sic] Counsel and subject to approval by the Court." (Doc. 82 at 10; Doc. 80-1 at ¶ 34). Chief Judge Merryday observed that there was no plan of "allocation" in the settlement agreement. (Doc. 82 at 10). Because a class member's decision to file a claim, opt out of the settlement, or take no action might depend on whether the class member will recover based on the extent to which that class member overpaid for oncology services (*pro rata*) or by potentially by another formula, Chief Judge Merryday found it important that the notice include information sufficient to allow a potential claimant to estimate any recovery. (Doc. 82 at 10-11).

Fourth, the settlement agreement also included a provision that prohibited a defendant from opposing class counsel's petition for attorney's fees, also known as a "clear sailing provision." (Doc. 82 at 11; Doc. 80-1 at ¶ 37). Chief Judge Merryday explained that these agreements can be troubling because they show class counsel negotiated some aspect of the fee

agreement with the defendants, even though counsel's ethical obligation is to the class.  (Doc. 82 at 11).  Although a "clear sailing provision" does not necessitate a finding of unfairness, it might suggest that the settlement agreement requires closer scrutiny to ensure that it is not the product of collusion.  (Doc. 82 at 11).  Further, the provision is particularly disfavored when it includes a reversion, returning the residue of the settlement fund to the defendant.  (Doc. 82 at 11).  Chief Judge Merryday pointed out that while the parties' settlement agreement contained a "clear sailing provision" it did not state whether the settlement agreement prohibits a reversion.  (Doc. 82 at 12).  While the notice stated that "no money will be returned to the Settling Defendants," Chief Judge Merryday asked that "the parties confirm whether the settlement agreement prohibits a reversion."  (Doc. 82 at 11-12; Doc. 80-3 at 35).  Finally, Chief Judge Merryday observed that the parties' notice failed to explain adequately the publication notice and did not attach of copy of the notice that the parties were to publish in local newspapers.  (Doc. 82 at 12-13).

Due to these concerns about the parties' proposed settlement agreement, Chief Judge Merryday deferred ruling on the plaintiff's motion (Doc. 80) and ordered plaintiff to show cause as to why the motion should not be denied in light of the deficiencies identified in the order, or to withdraw the preliminary approval motion and file a revised settlement agreement and preliminary approval motion.  (Doc. 82 at 13).

On April 26, 2019, plaintiff and proposed class counsel filed a memorandum in response to the order to show cause to address the Court's concerns.  (*See* Doc. 83).  Plaintiff explained that the parties had modified the proposed release to address the Court's concerns regarding the scope of the release, incorporating a new version attached to their response.  (Doc. 83 at 2-3; Doc. 83-2).  Plaintiff also addressed each of the Court's concerns with the proposed notice and

payment process.  (Doc. 83 at 3-8).  Plaintiff explained that a claims process was no longer

necessary as the parties have produced sufficiently reliable data to allow for an automatic

distribution of the settlement proceeds, with a *pro rata* distribution to class members.  (Doc. 83

at 4-5).

Further, plaintiff addressed the settlement administrative process and filed a separate

unopposed motion for approval of Epic Class Action & Claims Solutions, Inc. as settlement

administrator, seeking primary approval for Epiq as notice and settlement administrator.  (Doc.

83 at 5; Doc. 84).  Regarding the Court's concern about the proposed notice and payment

process, the response included a summary of both.  (Doc. 83 at 5-6).  In terms of the allocation of

the settlement fund, plaintiff states:

> The amount of the Settlement Fund after deduction of attorneys'
> fees, litigation expenses, class representative's incentive award, and
> notice and administration costs, as approved by the Court,
> shall be distributed in cash to the eligible class members.  (*See* Doc. 80-1 ¶
> 35).  The distribution will be *pro rata*; that is, each class member's
> share in the Settlement Fund will be proportional to the amount he,
> she, or it (in the case of an institutional payor) paid to FCS or 21st
> Century for Oncology Services during the class period.  To the
> extent that some individual class members' claims are for very small
> amounts, the Parties propose to pay a minimum of $5 to each class
> member.

(Doc. 83 at 6-7 (footnotes omitted).  In terms of providing class members enough notice to

estimate their individual recovery, plaintiff and proposed class counsel stated:

> It is not possible at this stage, however, to estimate what any
> individual class member might expect to be awarded in this action,
> because that will depend on several factors that are not currently
> known, including:  the total value of all payments to FCS and 21st
> Century by all class members during the class period; whether some
> class members exclude themselves from the Settlement; and the
> amount of attorneys' fees, litigation expenses, class representative's
> incentive award, and notice and administration costs (all subject to
> approval by the Court), which will be deducted before the Net
> Settlement Fund is distributed to the Settlement Class.  The question

of whether some potential class members opt out of the Settlement could affect the amount of distributions to remaining class members in at least two ways.

The Settlement Agreement provides that if potential class members whose aggregate payments to FCS and 21st Century exceed a certain threshold amount opt out, the Settlement Fund may be reduced proportionately. (Doc. 80-1 ¶ 28). On the other hand, if class members whose total payments are less than the threshold opt out, there will no reduction in the amount of the Settlement Fund, but there will be fewer class members to share in that amount. (*See* Notice at 6, Ex. 1A.) In addition, the revised form of notice describes the procedure for allocating and distributing the Settlement Funds and a statement that attorneys' fees will not exceed 30 percent of the Settlement Fund, litigation expenses will not exceed $100,000, and the class representative incentive award will not exceed $2,500 (all subject to the approval of the Court).

(Doc. 83 at 7-8 (footnote omitted)). Plaintiff contends that the information provided is typically enough to approve settlement classes and cites to decisions from the Southern District of Florida to support that proposition. (Doc. 83 at 8).[3]

Plaintiff also explained that there would be no reversion in terms of the "clear sailing provision" and the mediator confirmed that there was no collusion in reaching the settlement. (Doc. 83 at 8-10). Lastly, plaintiff and proposed class counsel addressed the Court's concern regarding the publication notice, attached copies of the proposed notice, and specified the publications in which the notice would be published. (Doc. 83 at 11; Doc. 83-2).

On June 5, 2019, Chief Judge Merryday entered an order finding, "[b]ecause the County's response to the April 4th order and the parties' amendments to the settlement agreement resolve the issues identified in the April 4 order and because the County otherwise

_____

[3] *See In re Checking Account*, 830 F. Supp. 2d 1330,1342, n.10) (S.D. Fla. 2011) (granting final approval and noting that "settlement notices rarely, if ever, provide" estimated recoveries for individual class members, and that "[i]t would have been false to provide each Settlement Class Member with a particular damage figure when that figure necessarily depended on such unknowns as the number of opt-outs and the outcome of the application for attorneys' fees").

satisfies the requirements of Rule 23, Federal Rules of Civil Procedure," the Court granted the County's motion for preliminary approval (Doc. 80). (Doc. 86 at 3). Further, the motion to approve Epiq Class Action & Claims Solutions, Inc. as the settlement administrator (Doc. 84) was granted. (Doc. 86 at 3). The motion to approve the plan of allocation (Doc. 85) was denied without prejudice as premature. (Doc. 86 at 3).

Chief Judge Merryday noted that courts commonly resolve a motion to approve a plan of allocation concurrently with a final approval of a class action settlement after the fairness hearing. (Doc. 86 at 3, n.4). Upon reviewing the parties' response to the show cause order, Chief Judge Merryday found that the parties' amendment to the settlement agreement to "tailor the release to the facts and circumstances of the class action complaint" satisfied Fed. R. Civ. P. 23. (Doc. 86 at 2-3; Doc. 83-4). Further, Chief Judge Merryday noted that the parties had resolved the uncertainty about the distribution of the settlement fund by removing the claiming process, clarifying that class members would be paid *pro rata*, and identifying a settlement administrator. (Doc. 86 at 2; Doc. 83 at 2-3; Doc. 83-4 at 3-4). The Court found the parties response satisfied his concern that the settlement agreement's "clear sailing provision" was not a result of collusion and that no reversion would occur. (Doc. 86 at 3; Doc. 83 at 8-10; Doc. 83-5 at ¶ 7; Doc. 83-6). Lastly, the Court found that the parties had sufficiently clarified the notice plan by providing a copy of the proposed publication notice and specifying the newspapers in which the notice would occur. (Doc. 86 at 3; Doc. 83 at 10-11; Doc. 83-3).

Thus, the Court held that the plaintiff's response and subsequent amendments to the settlement agreement satisfied the requirements under Fed. R. Civ. P. 23. (Doc. 86 at 3). Chief Judge Merryday held, "as amended, the parties' settlement agreement appears fair, reasonable, and adequate." (Doc. 86 at 4). Chief Judge Merryday defined the Settlement Class as:

> All persons or entities that paid for all or a portion of the cost of Oncology Services in Southwest Florida to 21st Century Oncology LLC (21st Century) or FCS or any current or former subsidiary or affiliate of 21st Century or FCS, or any co-conspirator, during the period from and including January 1, 2010 until the date of preliminary approval of the Agreement. Excluded from the Settlement Class are Defendants, the officers, directors and employees of any Defendant, the parent companies, subsidiaries and affiliates of any Defendant, the legal representatives and heirs or assigns of any Defendant, any federal government entities and instrumentalities of the federal government, and states and their subdivisions, agencies, and instrumentalities.

(Doc. 86 at 4). Upon finding the proposed Settlement Class satisfied Fed. R. Civ P. 23(a) and 23(b)(3), Chief Judge Merryday certified the class for the purpose of settlement. (Doc. 86 at 4-5). The Court found the County could fairly and adequately protect the interest of the class and subsequently appointed the County of Monmouth, New Jersey as class representative. (Doc. 86 at 5).

Under Rule 23(g)(1)(A), moreover, the Court appointed Eamon O'Kelly of Robins Kaplan LLP as class counsel. (Doc. 86 at 5-6). The Court accepted the parties' revised proposed notice to class members (Doc. 83-2), subject to two modifications,[4] finding the notice concisely and satisfactorily described the action. (Doc. 86 at 6-7). Moreover, Chief Judge Merryday ordered:

> No later than June 17 2019, FSC and 21st Century must produce to class counsel "any data [the plaintiff] deem[s] necessary or appropriate to facilitate notice." (Doc. 80- at 7) No later than July 22, 2019, the County must mail notice to each class member. No later than August 5, 2019, the County must publish the proposed publication notice (Doc. 80-3) in both the *News-Press* and the *Sarasota Herald-Tribune*. No later than September 9, 2019, class counsel may move for reasonable attorney's fees and costs. A class member who does not opt out of the settlement can object to the settlement.

---

[4] Chief Judge Merryday ordered the parties amend the address in the revised proposed notice, and the explanation of the requirements for an objection. (Doc. 86 at 7-8, nn.5-6).

(Doc. 86 at 7-8).  Importantly, Chief Judge Merryday instructed potential objectors that to object, the class member must submit a written objection to both the Court and the settlement administrator no later than September 30, 2019.  (Doc. 86 at 7).  Chief Judge Merryday listed the Court's address and ordered the parties the amend the address in the revised proposed notice.  (Doc. 86 at 7-8, n. 5; Doc. 83-2 at 8).  Chief Judge Merryday also specified certain instructions and information the notice to potential objectors must include and ordered the parties to amend the revised proposed notice to incorporate those requirements.  (Doc. 86 at 8, n. 6).[5]  Finally, Chief Judge Merryday directed that no later than October 15, 2019, the parties must respond to an objection and must move for final approval of the settlement.  (Doc. 86 at 8).

A fairness hearing was set before the Undersigned on October 29, 2019.  (Doc. 86 at 8).  Chief Judge Merryday explained in his order setting the hearing that a class member who submitted a timely written objection can object to the settlement.  (Doc. 86 at 8).  The order stated clearly that any determinations and judgments in this action will bind all class members and at the class member's own expense, any member of the settlement class may appear, individually or through counsel, in the action.  (Doc. 86 at 9).  Lastly, the Court's order specified that class counsel will represent a class member who fails to appear.  (Doc. 86 at 9).

On September 9, 2019, in accordance with Chief Judge Merryday's previous order, plaintiff filed an unopposed motion for final approval of class settlement (Doc. 92) and plan of

---

[5]  Chief Judge Merryday ordered the parties to amend the proposed notice to state the requirements for an objection as follows:  "A written objection must not exceed TWENTY PAGES and must include:  1) the name of the action (*County of Monmouth, New Jersey v. Florida Cancer Specialists, P.L.*) and the case camber (2:18-cv-201-T-23MRM); 2) the objector's name, mailing address and telephone number; 3) a copy of any document establishing the objector is a class member;  4) an explanation of the objection and evidence necessary to evaluate the objection's merit; and 5) the objector's signature.  (Doc. 86 at 8 (footnote omitted)).

allocation (Doc. 92-1). Attached was the declaration of Brian Pinkerton (Pinkerton), a senior project manager for Epiq Class Action and Claims Solutions Inc. (Doc. 92-2). Pinkerton attests that on June 12, 2019, in accordance with the Court's order, class counsel provided data files to Epiq containing contact information and payment data relating to settlement class members. (Doc. 92-2 at 3). Specifically, Pinkerton states that, on June 17, 2019, counsel for defendants provided Epiq data containing contact information and payment data identified by defendants as relating to settlement class members. (Doc. 92-2 at 3). After combining and de-duplicating the data provided by the parties, Epiq states there were 94,595 distinct class member records loaded into the settlement database. (Doc. 92-2 at 4). Pinkerton states that Epiq, in compliance with the Court's order, on July 22, 2019, mailed the court-approved notice to 94,583 class members with a valid mailing address. (Doc. 92-2 at 4, n.2). Pinkerton maintains that Epiq was unable to mail notice to twelve (12) class members because they did not have a valid mailing address. (Doc. 92-2 at 4). According to Pinkerton "as of September 6, 2019, Epiq has received 1,209 notices returned by the Post Office as undeliverable. Epiq will be performing skip trace address searches for each Settlement Class Member whose notice was undeliverable and will re-mail notices to all Settlement Class Members for whom a more current address can be located." (Doc. 92-2 at 4).

As to the Court's order regarding publication notice, Pinkerton maintains Epiq facilitated the notice of the proposed settlement in both the *Fort Myers News-Press* and the *Sarasota Herald Tribune* beginning on July 25, 2019, and the notice ran in each publication on Thursday, July 25, 2019 and Sunday, July 28, 2019. (Doc. 92-2 at 4). Pinkerton further states that on July 19, 2019, in accordance with the agreement and Court-approved notice, Epiq launched a settlement website, www.FCSClassAction.com, so settlement class members could obtain additional information and documents related to this action. (Doc. 92-2 at 4-5).

On October 15, 2019, plaintiff filed a supplemental statement regarding exclusions from the settlement class in further support of its motion for final approval of the class action settlement. (Doc. 97 at 2). Specifically, plaintiff maintains that:

> By the September 20, 2019 deadline, a total of 54 class members had exercised their right to exclude themselves from the Settlement, representing total payments to FCS and 21st Century during the Class Period of $38,409,359.24. This amount was below the threshold [specified in the parties' Confidential Side Letter] that would have permitted FCS to terminate the Settlement under paragraphs 39 and 40 of the Settlement Agreement (see discussion below). Accordingly, FCS will not terminate the Settlement Agreement, and the Settlement Amount of $7,187,500 will be paid in full.

(Doc. 97 at 2). Further, plaintiff contends that the settlement agreement also provided that in certain circumstances, the settlement fund "is to be reduced by an amount proportional to the Exclusion Amount." (Doc. 97 at 3; Doc. 83-4 ¶¶ 27-28). In this case, plaintiff claims there will be "no reduction under this provision" and the settlement amount of $7,187,500.00 will be paid in full. (Doc. 97 at 3).

This Undersigned conducted a fairness hearing on October 29, 2019, in accordance with Chief Judge Merryday's order preliminarily approving the settlement. (Doc. 86; *see also* Tr. 3-72). The Undersigned allowed any class member who submitted a written objection and appeared at the hearing to address his or her objections to the settlement at the hearing. (*See* Tr. at 5-6, 61-68). Following the fairness hearing, for the reasons explained below, the Undersigned recommends that the plaintiff's unopposed motion for final approval of class settlement and plan of allocation be granted subject to slight modification of the allocation plan (Doc. 92) and plaintiff's counsel's application for (1) an award of attorney's fees, (2) reimbursement of expenses, and (3) class representative's incentive award; and incorporated memorandum of law (Doc. 93) be granted.

**DISCUSSION**

**1.      Approval of the Class Settlement**

Courts have consistently held that settlements are "highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits." *Miller v. Rep. Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977). In reviewing a proposed settlement of a class action, the Court must determine that the proposed settlement is "fair, adequate and reasonable." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); Rule 23(e)(2).

The Eleventh Circuit has outlined several factors that a Court must consider in determining whether a proposed class-action settlement is fair, adequate, and reasonable:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved.

*See Bennett*, 737 F.2d at 986. In evaluating these factors, the Court may "rely upon the judgment of experienced counsel for the parties," and "absent fraud, collusion, or the like," is "hesitant to substitute its own judgment for that of counsel." *See Canupp v. Liberty Behavioral Health Corp.*, 417 F. App'x 843, 845 (11th Cir. 2011) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

Further, as of December 1, 2018, Fed. R. Civ. P. 23 was amended to add a mandatory, but non-exhaustive set of comparable final approval criteria. In determining a final approval of a class action settlement, the Court must find:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into

13

account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). For the reasons discussed below, the Undersigned finds the proposed settlement satisfies the these criteria and is fair, adequate, and reasonable.

After three mediation conferences, the parties agreed on a settlement (Doc. 80-1) and on February 22, 2019, plaintiff and proposed class counsel moved unopposed for a preliminary approval of the settlement agreement. (Doc. 80 at 9). Accordingly, FSC denied any wrongdoing, and decided to settle "in order to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation and to obtain releases." (Doc. 80-1 at 3). FCS agreed to pay the class no more than $7,187,500.00. (Doc. 80-1 at ¶ 7). The parties claim the settlement agreement would resolve all claims against FSC. (*See* Doc. 80 at 8; Doc. 80-1 at 3; Doc. 83-4 at ¶ 20). Chief Judge Merryday found this release to be properly tailored to the facts and circumstances in this case. (Doc. 86 at 2). The parties stipulated that the settlement provides "substantial and meaningful relief" and the terms of the settlement were reasonable and consistent with applicable case law. (Doc. 80 at 8).

The agreement provides that the settlement fund after deduction of any taxes, attorney's fees and litigation expenses, class representative's incentive award, and class notice and administration costs, will be distributed in cash to the eligible class members. (Doc. 80-1 at ¶ 35). The parties agree the distribution will be made *pro rata* and to the extent that some class members' claims are for *de minimis* amounts, the parties propose to pay a minimum of $5.00 to each class member. (Doc. 83 at 5,7; Doc. 92 at 7, 13; Doc. 92-1 at 2; Doc. 92-2 at 11, 17, 18).

The parties seek $2,500.00 as an incentive award for County of Monmouth, New Jersey as class representative as well as attorney's fees for Plaintiff's counsel and reimbursement of ligation costs. (Doc. 93 at 8-9).

Following Chief Judge Merryday's preliminarily approval of the settlement agreement, the parties complied with most modifications instructed regarding the notice to class members. (Doc. 86 at 7-8; Doc. 92-2 at 13-14). The parties properly amended the address in the revised proposed notice according to the Court's June 5 order. (Doc. 86 at 7; Doc. 92-2 at 13). However, the parties only partially complied with Chief Judge Merryday's instruction to revise the proposed notice to include additional explanation regarding the requirements for an objection. (Doc. 86 at 8; Doc. 92-2 at 14-15). Although the parties modified the notice as to the process for objection, they failed to include the instruction that an objector must list "the name of the action (*County of Monmouth, New Jersey v. Florida Cancer Specialists, P.L.*) and the case number (2:18-cv-201-T-23MRM)," and they also failed to instruct that the objection must not exceed twenty pages. (Doc. 92-2 at 13-14; *see* Tr. 29-31). The Undersigned finds, however, that the failure to include these instructions to the objectors did not materially impact the objection process. In this action—with a class of over 95,000 total class members—there was only one proper and timely objection filed, which objection was only 2 pages in length, and another improperly filed objection that was only one page in length. (*See* Doc. 97 at 3; Doc. 91 at 1; Doc. 96-1 at 3). Therefore, the Undersigned finds the parties' failure to comply strictly with these court-ordered requirements does not now necessitate forcing the parties to incur further time and expense to re-administer the notice to comply fully with the June 5 order because the likelihood that these oversights materially impacted the objection process is virtually non-existent.

## A.    Elias Objections

On September 3, 2019, Mr. William G. Elias, on behalf of his wife Sandra E. Elias, filed an objection (Doc. 91) to Chief Judge Merryday's order granting preliminary approval of settlement.  In his objection, Mr. Elias states that he objects to the proposed settlement's approach in regard to the *pro rata* basis and maximum incentive award of $2,500.00.  (*See* Doc. 91 at 1; Doc. 92-2 at 11, 12, 14).  The basis of his objection appears to be the alleged incorrect use of chemotherapy during Mrs. Elias' underlying treatment.  (Doc. 91 at 1-2).  The Undersigned notes neither Mr. nor Mrs. Elias attended the October 29, 2019 hearing.

The Undersigned finds this objection has no bearing on a fairness determination because an allegation of medical malpractice does not impact the fairness, adequacy, or reasonableness of the settlement agreement itself.  *See Bennett v. Behring Corp*., 737 F.2d 982, 986 (11th Cir. 1984).  The objection is void of any claim that the settlement itself is unreasonable, instead it simply asks the Court to take into consideration "unfortunate circumstances" instead of a mathematical formula to arrive at the final judgment.  (Doc. 91 at 2).  The settlement agreement here is the result of a negotiated resolution of an alleged antitrust violation.  The basis for the Elias' objection, however, is not any alleged overpricing or an antitrust issue but, instead, alleged medical malpractice in Mrs. Elias' individual case.  (*See* Doc. 91 at 1-2).

The Undersigned finds the Elias' objection is without consequence in determining the fairness, adequacy, or reasonableness of the settlement agreement.  *See Bennett*, 737 F.2d at 986.  The Undersigned further notes that the release of claims provision included in the amendment to the settlement specifically excludes "individual claims arising in the ordinary course of business for any alleged medical malpractice or breach of contract related to FCS's Oncology Services."

(Doc. 83-4 at ¶ 20). Thus, to the extent Mr. and Mrs. Elias seek any additional relief based upon alleged malpractice, they are still free to pursue their claim independently of this action.

Lastly, the Elias' objection also includes an objection to the maximum incentive award ($2,500.00), but is void of any reasons for the objection as required by Chief Judge Merryday's order and the notice provided to the class members. (Doc. 91 at 1; Doc. 86 at 8; Doc. 92-2 at 14). For all of these reasons, the Undersigned recommends overruling the Elias' objection.

### B. Menard Objection

On October 15, 2019, Plaintiff filed a response to the objection(s) to the settlement (Doc. 96) and included in the response one late-received objection filed by Gerard P. Menard that had not been filed with the Court. (Doc. 96 at 8). Plaintiff contends this objection should be overruled because it was not timely received by the class administrator, not received by the Clerk of Court at all, and is based on a misunderstanding of the distribution process. (Doc. 96 at 8-9).

Mr. Menard appeared at the October 29, 2019 fairness hearing to support of his objection. (Tr. 5). At the hearing, Mr. Menard took the position that his objection should be considered as timely because he had mailed out his objection to the administrator (postmarked September 23, 2019) and, therefore, the letter should have been received before the court-ordered September 30, 2019 deadline. (*See* Tr. 74). Plaintiff's counsel explained that when the class administrator receives mail, it is automatically time-stamped and date-stamped; therefore it was unlikely that Mr. Menard's objection was timely received. (Tr. 70). Because the time stamp on Mr. Menard's objection is dated October 2, 2019, and there is no factual basis to find any error in the time stamp, the Undersigned recommends Mr. Menard's objection be deemed untimely submitted and over-ruled on that basis. (Doc. 96-1; Doc. 99-1).

Alternatively, even if the objection were deemed to be filed timely, the Undersigned finds that the objection should be overruled on the merits. Mr. Menard's objection seems to be based on a misunderstanding of the claims process. (Doc. 96-1 at 3; Doc. 99-1 at 1). Mr. Menard appears to object to the proposed settlement on the basis that he "paid approximately $13,000 to [FCS] during the stated period of time," and that although he has financial documents evidencing this, he was told by the settlement administrator by telephone that it was not necessary to provide these documents. (Doc. 96-1 at 3; Doc. 99-1 at 1; S*ee* Tr. 64, 67). Mr. Menard posits that he does not know how the settlement can be fairly allocated without the necessary documentation. (Doc. 96-1 at 3; Doc. 99 at 1; *See* Tr. 64, 67).

As previously discussed, however, Chief Judge Merryday approved a direct distribution plan that does not require class members to provide their financial documents. (Doc. 86 at 2-3). In fact, in Chief Judge Merryday's April 4, 2019 order, he cautioned the parties against a claiming requirement and indicated FCS possessed the records necessary to provide a satisfactory, inexpensive, and accurate distribution of the settlement fund sufficiently reliable data to make an automatic distribution possible to class members. (*See* Doc. 82 at 8). Pursuant to the order, the parties determined that instead of a claiming process, they would use an automatic payment process, with a *pro rata* distribution to class members. (Doc. 83 at 4). Thus, the Court has already determined that the most effective way for this settlement to be allocated is by an automatic distribution process, removing the need and concern when class member are required to opt in and provide documentation. Further, Mr. Menard's objection should be overruled because it does not specifically address or challenge the fairness or adequacy of the remaining terms of the settlement. *See Bennett*, 737 F.2d at 986; (*see also* Doc. 96-1 at 3; Doc.

99-1 at 1). For these reasons, the Undersigned recommends Mr. Menard's objection be overruled.

**2.  Approval of the Plan of Allocation**

For the reasons above, the Undersigned finds that the settlement agreement overall is fair and reasonable. However, the Undersigned recommends the settlement agreement be approved subject to Chief Judge Merryday ordering the parties to submit a further modified plan of allocation. (Doc. 92; Doc. 92-1). Currently, the plan of allocation states, if a balance remains in the settlement fund after initial distributions and the void date has passed, the class representative *may* request approval from the Court to distribute the balance to "charities or other appropriate beneficiaries." (Doc. 92-1 at 2). The Undersigned takes slight issue with the permissive nature of the language contained in the plan of allocation as it stands. At the hearing the Undersigned questioned class counsel, Mr. O'Kelly about this language:

> THE COURT: . . . [W]hy does the [plan of] allocation say the class rep may request the Court for distribution to charities, et cetera? Why is it permissive as opposed to mandatory?
>
> MR. O'KELLY: With respect to the last two if I may address them first, Your Honor. I think you read this far more closely than we did, and we probably should have read it so closely. By "may" we intended simply that if the circumstance that we described there arose, then that's what would happen, but, of course, we can't be certain that that circumstance will arise, that there will be a residual amount leftover that's too uneconomical to Distribute.
>
> If it turned out that the cost of making the second distribution would overwhelm the relatively small amount that was left in the fund then there wouldn't be a second distribution. But we certainly didn't intend "may" to be discretionary, and in retrospect I think "shall" would have been a better choice of words on our part.
>
> THE COURT: . . . But there is no objection from you, as class Counsel, to considering or revising the allocation plan to make that a mandatory requirement?

MR. O'KELLY: Absolutely not. We intended it to be if the situation arose where the residual amount could not be distributed to the class members.

(Tr. 38-39).

From this discussion with counsel at the fairness hearing, it appears there would be no objection to modifying the plan of allocation to correct the permissive language at issue to make it mandatory. Therefore, the Undersigned recommends the Court grant the settlement agreement subject to ordering the parties to submit a modified plan of allocation *requiring* Court approval to distribute any remaining balance of the settlement fund to charities or other appropriate beneficiaries.

### 3.     Motion for Attorney's Fees, Reimbursement Expenses, and Incentive Award

Plaintiff's counsel, Robins Kaplan LLP, moves for the following to be paid from the settlement fund: (1) attorney's fees in the amount of $2,156,250.00—30% of the settlement if the final settlement amount is not reduced because of opt-outs;[6] (2) reimbursement of expenses in the amount of $69,939.38.00,[7] and (3) an incentive award to the class representative, County, in the amount of $2,500.00. (Doc. 93 at 8-9). The Undersigned turns to addressing each request individually.

### A.     Attorney Fees

Counsel maintains they have created a substantial benefit for the class and should be entitled to compensation for their services from the common fund. (Doc. 93 at 10-11); *see*

---

[6] In Plaintiff's supplemental statement regarding exclusions, it stated that there would be no reduction in the settlement amount such that the final amount of settlement $7,187,500.00 was to be paid in full. (Doc. 97 at 3). Thus, because the settlement amount was not reduced, it would follow plaintiff's counsel is seeking 30% of $7,187,500.00, or $2,156,250.00.

[7] Expenses are described in detail in the Declaration of Eamon O'Kelly in Support of Plaintiff's Counsel's Application for (1) An Award of Attorney's Fees, (2) Reimbursement of Expenses, and (3) Class Representative's Incentive Award. (Doc. 93-1).

*Camden I v. Condo. Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991). Further, counsel argue that it is long-settled that when a class action suit is successful, attorneys who created the class discovery are entitled to reimbursement from the common fund of the settlement for their "reasonable litigation expenses, including reasonable attorney's fees." (Doc. 93 at 11). Plaintiff's counsel contend that having reached excellent settlement results with Defendants, they are entitled to an award of attorney's fees equal to 30% of the Settlement Fund and in support state, "[a]n award of attorney's fees in that amount would be well within the range of fee awards in complex class actions in the 11th Circuit. It would also provide a multiplier of 1.82 on counsel's time spent from February 14, 2018, through August 31, 2019, less than the multipliers in many other antitrust cases." (Doc. 93 at 8).

The Eleventh Circuit has held that the proper method for calculating attorney's fees from a common fund is the percentage of fund method. *Poertner v. Gillette Co.*, 618 F. App'x 624, 628 (11th Cir. 2015) (citing *Camden I Condo. Ass'n*, 946 F.2d at 774-75). In determining the appropriate percentage of a common fund to be awarded as a fee, the Eleventh Circuit has stated, "there is no hard and fast rule mandating certain percentage of a common fund which may be reasonably awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Camden I*, 946 F.2d at 774. Still, the majority of common fund fee awards fall in the range of 20% to 30% in accordance with individual circumstances of each case. *Id.* at 774-75.

The circumstances that allow for adjustment are set out in *Johnson v. Ga. Highway Express, Inc.*, as follows:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee

is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability of the case"; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases.

488 F.2d 714, 717-19 (5th Cir. 1974); *see also Camden I*, 946 F.2d at 772 n.3. The district court is also to consider any substantial objections, the economics involved in prosecuting the action, and any other factors that would be relevant to the Court's determination. *Camden I*, 946 F.2d at 775. Here, pursuant to the class settlement agreement, class counsel requests an award of attorney's fees in the amount of $2,156,250.00, representing 30% of the settlement fund. (*See* Doc. 93 at 8). The Undersigned considers these factors in turn below to determine whether counsel's fee request is reasonable.

### 1. Nature of Contingency Fees and the Burden and Economics of Prosecuting a Class Action

The inherit risk of a contingency fee arrangement is an important factor in determining the reasonableness of a fee award. *See Ressler v. Jacobson*, 149 F.R.D. 651, 653 (M.D. Fla. 1992). Given the inherit risks as well as the substantial time, effort, and money needed to sustain the representation of a class client, the "bonus" from a contingency fee arrangement is necessary. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1365 (S.D. Fla. 2011) ("Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client.") (citing *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988)).

Here, class counsel assumed major risks in undertaking this representation.  First, class counsel would have the difficult burden of proving the existence of a conspiracy and that the alleged conspiracy caused damages.  (Doc. 93 at 19); *see, e.g.*, *Atlantic Richfield Co., v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  Second, class counsel had the additional hurdle of satisfying Rule 23 and establishing the appropriateness for this case to proceed as a class.  (Doc. 93 at 20).  Further, there was ample potential for challenges in litigating this matter.  The defendants here denied liability and before settlement, plaintiffs were faced with a motion to dismiss.  (Doc. 93 at 20, Doc. 47).  Had plaintiff overcome the motion to dismiss, class counsel contends they would have had difficulty in certifying the class because the healthcare market is "exceptionally complex" and defendants would try to "use these complaints to its advantage" in opposing class certification.  (Doc. 93 at 20).  Class counsel was wary of the additional hurdle of defendants possibly moving for summary judgment and ultimately the uncertain outcome of a jury trial in an antitrust case, which typically necessities a "battle of the experts" before a lay jury.  (Doc. 93 at 21); *see Behrens*, 118 F.R.D. at 542 (noting that a likely "battle of experts" at trial regarding the issue of damages could pose "great difficulty" for plaintiffs).  Thus, the Undersigned recommends the Court find the risks borne by class counsel support the appropriateness of the fee requested.

### 2. Requested Fee Reflects the Market Rate in Other Complex, Contingent Litigation

The percentage method of awarding fees is intended to mirror the practice in the marketplace where attorneys negotiate percentage fees with their clients.  *Pinto v. Princess Cruise Line*s, 513 F. Supp. 2d 1334, 1340 (S.D. Fla. 2007).  Accordingly, "attorneys regularly contract for contingent fees between 30% and 40% directly with their clients."  *Pinto*, 513 F. Supp 2d at 1341.  Here, the Undersigned finds a fee of 30% is reasonable in light of the

customary percentage fee award for attorney's fees derived from a settlement fund. *See Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291, 1300 (11th Cir. 1999) (affirming a district court award of fees in the amount of 33.5% of the settlement fund); *see also Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1267 (S.D. Fla. 2016) ("[A] fee award of 33% . . . is consistent with attorneys' fees awards in federal class actions in this Circuit.").[8]

### 3.     The Novelty and Difficulty of the Issues

Courts have long recognized that the novelty and difficulty of the issues in a case are to be considered in determining a fee award. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-18 (5th Cir. 1974). The instant action, an alleged antitrust conspiracy, is among the most complex and difficult to litigate. *See In re Motorsports Merchandise Antitrust Litig*., 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000). Class counsel not only was presented with complex legal issues that accompany an antitrust class action suit, but also was responsible for analyzing pricing and collection data for purposes of complex data analysis. (Doc. 93 at 15-16; Doc. 93-1 ¶ 14). Class counsel contends:

> FCS treated patients with 23 different types of cancers during the Class period, each of which required different diagnostic and treatment regimes. (*Id*. [93-1] ¶14 ). In order to perform an overcharge damage analysis, it was necessary to compare the treatment regimes and costs of treatment for each type of cancer in the relevant geographic market in Southwest Florida with benchmarks derived from corresponding treatments and costs in other parts of Florida. *Id*. It was also necessary to devise an economic methodology that would account for statistical outliers among patient groups (for example, patients who received significantly less or more treatments than average for a particular cancer type, or patients whose cancer recurred and who thus required treatment over multiple years).

---

[8]  *Waters v.* Cook's *Pest Control, Inc.*, No. 2:07-cv-394-LSC, 2012 WL 2923542, at *18 (N.D. Ala. Jul. 17, 2012) (awarding 35%); *Morefield v. NoteWorld, LLC*, No. 1:10-cv-00117, 2012 WL 1355573, at *5 (S.D. Ga. Apr. 18, 2012) (awarding 33.33%).

(Doc. 93 at 16, Doc. 93-1 ¶14). Clearly, the issues in this case point to and underscore the overall complexity and novelty of the action. Thus, the Undersigned recommends the Court find these factors also support the reasonableness of the requested fee.

### 4. The Skill, Experience, and Reputation of Class Counsel

When evaluating a requested fee, courts also consider the experience, reputation, and ability of both class counsel and opposing counsel. *Gibbs v. Centerplate, Inc.*, No. 8:17-cv-02187-EAK-JSS, 2018 WL 6983498, at \*8 (M.D. Fla. Dec. 28, 2019). The background summaries provided for class counsel have shown they are experienced with a proven record in the area of complex litigation. (Doc. 93 at 16-18). Further defendants' counsel from the firm Foley & Lardner also have a reputation of being highly experienced in the field of complex litigation. (*See* Doc. 93 at 23). Hence, the Undersigned recommends the Court find the skill, experience, and reputation of the representation supports the requested fee.

### 5. The Amount Involved and Results Obtained

According the Eleventh Circuit in *Camden I*, the "common fund is itself the measure of success;" therefore the "monetary results achieved predominate over all other criteria." *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 770, 773 (11th Cir. 1991); *see Gibbs* 2018 WL 6983498, at \*8 ("Stated another way, the amount involved, and results obtained is the most important factor in determining an award of attorneys' fees."). Here, class counsel achieved a settlement in the amount of $7,187,500.00, guaranteeing a measure of relief to each class member. (Doc. 93 at 8). Additionally, class counsel was able to negotiate with defendants to create a "wholly cash fund" for the class. (Doc. 93 at 8); *see Wolff v. Cash 4 Titles*, No. 03-22778-CIV, 2012 WL 5290155, at \*3 (S.D. Fla. Sept. 26, 2012) (explaining that unlike cases where attorneys petitioned for a fee award after obtaining non-monetary relief such as

"coupons," class counsel created "substantial, tangible, and a real benefit to the class," by creating a wholly cash fund). Further, by settling early, the parties avoided significant additional fees and costs. The settlement spared the class members from the both "uncertainties and expense" of protracted litigation and the likelihood of possible appeals. (*See* Doc. 93 at 21). Therefore, the Undersigned recommends that the Court find that the amount involved, and the results achieved support the requested attorney fees.

### 6.     Time and Labor of Class Counsel

Despite the risks and costs in pursuing this matter, class counsel expended much time and effort in providing representation for over 17 months while prosecuting and settling the claims. (*See* Doc. 93 at 13). Plaintiff's counsel states "since Plaintiff's counsel began its initial investigation into the conduct at issue in this case on February 14, 2018, counsel spent a total of 1741.70 hours prosecuting the lawsuit through the end of August 2019." (Doc. 93 at 13). Here, class counsel received no compensation in this case during the over two years of litigation. During this time, counsel conducted economic investigation, engaged in discovery, drafted and filed several motions, participated in mediation, negotiated and drafted the settlement agreement, and sought competitive bids from escrow agents and settlement administrators. (Doc. 93 at 13-14; Doc. 93-1 ¶¶ 11-12). Indeed, this list is non-exhaustive and, considering the number of hours spent on this case, counsel was surely precluded from engaging in other matters and cases they could have otherwise pursued but for the time devoted to this case. (*See* Doc. 93 at 13-14; Doc. 93-1 ¶¶ 11-12). Considering the hours worked by class counsel and efforts made to both prosecute and settle this action, the Undersigned finds the fee requested is appropriate and fair.

The Undersigned takes particular note of the undesirability of this case and the fact that while it became public knowledge in January 2017 that FCS and 21st Century had potentially

colluded to restrain competition in Oncology Services in Southwest Florida, Robins Kaplan was the only law firm that came forward and prosecuted the matter as a class action. (Doc. 93 at 24). Further, public policy supports the awarding of attorney's fees, especially in class action cases. *See Ressler v. Jacobson*, 149 F.R.D. 651, 657 (M.D. Fla. 1992) ("[P]ublic policy favors the granting of counsel fees sufficient to reward counsel for bringing these [class] actions and to encourage them to bring additional such actions."). In light of the foregoing factors, the Undersigned recommends that the Court award class counsel's requested attorney's fees in the amount of $2,156,250.00, representing approximately 30% of the settlement fund as compensation for their services on behalf of the class.

### B. Litigation Expenses

Courts have consistently held that plaintiffs' attorneys are entitled to reimbursement of reasonable and necessary costs incurred in a course of activities that benefit the class. *See Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999) ("Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefitted the class."). Additionally, the Court approved the notice to class members informing them that class counsel may move for costs not exceeding $100,000.00. (Doc. 86 at 6, Doc. 83 at 6). Here, class counsel provided adequate documentation supporting their request of $68,939.38 in expenses incurred in prosecuting this action. (Doc. 93 at 27; Doc. 93-1 ¶ 17.). Class counsel sufficiently details how the fees were necessary for this action, including the fact that $54,075.00 of the amount was paid to economic consultants for assistance with data analysis. (Doc. 93 at 27). Given class counsel has provided enough information indicating the reasonableness of the requested reimbursement of expense, and the fact that it is well under the $100,000.00 limit set

by this Court, the Undersigned recommends the Court find class counsel are entitled to reimbursement of the full amount of $68,939.38 in litigation costs and expenses.

### C.      Class Representative Incentive Award

"[C]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218-19 (S.D. Fla. 2006) (quoting *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa .2000)); *see also Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175, 1197 (11th Cir. 2019) (noting incentive awards may be given to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, to recognize their willingness to act as a private attorney general, and to induce an individual to become a named plaintiff). The Eleventh Circuit has held, "district courts may exercise their discretion to determine whether they favor an incentive award in any given case." *Muransky*, 922 F.3d at 1197. Class counsel contends the Court should recognize that class representatives efforts in pursuing this action. (Doc. 93 at 28). The County has been actively involved in this action by assisting in the initial investigation of the claims, reviewing documentation prior to filing, and providing records to assist with damages analysis, and it generally has participated in this litigation. (Doc. 93 at 28). Given the County's role and similar awards in this district, the Undersigned recommends the Court award $2,500.00 as incentive to the County, to be paid from the settlement fund. *See Lamones v. Human Resources Inc.*, No. 8:16-cv-2422-T-35AAS, 2018 WL 8578301, at *1 (M.D. Fla. Aug. 2, 2018) (recommending an incentive award of $3,500.00); *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-cv-2424-T-23JSS, 2017 WL 2472499, at *2 (M.D. Fla. June 5, 2017) (ordering an incentive award of $5,000.00); *N. Star Capital*

*Acquisitions, LLC v. Krig*, 3:07-cv-264-J-32MCR, 2011 WL 65662, at *6 (M.D. Fla. Jan. 10, 2011) (ordering incentive award of $5,000.00).

### D. Settlement Administration Expenses

Settlement administrators are typically entitled to "reimbursement for fees, costs, and expenses incurred in connection with the administration of the settlement fund," subject to the approval of the Court. *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1357 (11th Cir. 2003). In considering a request for an award of expenses, a court must determine whether class counsel has shown that the requested expenses are reasonable and necessary to the prosecution of the case. *See Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999). While class counsel does not formally request administrative costs in their motion, they note:

> Plaintiff's counsel reserves the right to seek reimbursement of further expenses incurred after August 31, 2019 (for example, travel costs associated with the fairness hearing). In addition, Plaintiff will seek at a later time payment of Epiq's fees for settlement administration. Epiq has provided Robins Kaplan with an estimate of $251,862 for all of its work on this matter plus $4,794.20 for publication costs. Pursuant to Paragraph 35 of the Settlement Agreement, $39,069.69 has already been paid to Epiq for providing notice to the Class. The remaining $217,586.51 is only an estimate, and it is possible that the final amount to be paid to Epiq may be higher, possibly as much as $260,000.

(Doc. 93 at 27, n. 6). Class counsel does not address whether the expenses Epiq incurred were reasonable or necessary, but the Undersigned finds the above-mentioned administration expenses were fair and reasonable in this case. *See also Williams v. Mohawk Indus., Inc.*, No. 4:04-cv-0003-HLM, 2010 WL 11500061, at *9 (N.D. Ga. July 22, 2010) (awarding $285,000.00 in settlement administration expenses and determining these expenses to be "fair and reasonable"). Upon review of the declaration by senior project manager for Epiq, Brian Pinkerton, Epiq's duties were broad and included: standardizing data for contact information of class members,

directly administering the Court approved notice of the proposed settlement, publishing notice of the proposed settlement in two print newspapers, receiving and processing requests for exclusion from the settlement, receiving and processing any objections to the settlement, and calculating and distributing settlement award checks to class members. (Doc. 97-1 ¶ 3; Doc. 92-2 at 4). In addition, Epiq launched and managed settlement website as well as a toll-free hotline for class members to seek additional information regarding the settlement available 24 hours a day, 7 days per week. (Doc. 97-1 ¶ 8-11; Doc. 92-2 at 4-6). Further, the settlement agreement provides that the settlement fund will be first administered to pay for all "reasonable, necessary, and documented class notice and administrative expenses," and there have been no objections on the basis of "administrative expenses." (*See* Doc. 91; Doc. 96-1; Doc. 99-1). The services Epiq provided appear to have been reasonable and necessary to disseminate effectively the notice and to administer the settlement fund efficiently. Accordingly, the Undersigned recommends the Court find the cost of providing settlement administration services is reasonable and the potential requested amount estimated at $217,586.51.00, but possibly as much as $260,000.00 be approved.

## CONCLUSION

For these reasons, the Undersigned **RESPECTFULLY RECOMMENDS**:

1.     Plaintiff's unopposed motion for final approval of class settlement and plan of allocation (Doc. 92) be **GRANTED** subject to the parties filing an amended plan of allocation by a date certain resolving the issue described above. (Doc. 92-1);

2.     Plaintiff's counsel's application for (1) an award of attorney's fees, (2) reimbursement of expenses, and (3) class representative's incentive award; and incorporated memorandum of law (Doc. 93) be **GRANTED**;

3.  Class counsel's attorney's fees request of 30% of the settlement fund, or $2,156,250.00, be approved;

4.  Class counsel's expenses in the amount of $68,939.38 be approved;

5.  County of Monmouth, New Jersey incentive award in the amount of $2,500.00 be approved; and

6.  The Court find the cost estimate of Epiq's services in providing settlement administration services reasonable and approve the potential requested amount estimated at $217,586.51, but possibly as much as $260,000.00.

Respectfully recommended in Chambers in Ft. Myers, Florida on February 21, 2020.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. The parties are, of course, free to expediate the presiding United States District Judge's consideration of this Report and Recommendation by filing a written notice stating that they do not object. A party seeking to respond to any written objection may only do so upon invitation by the Court or after requesting and receiving leave of the court to do so.

Copies to:

Counsel of Record
Unrepresented Parties